**HUGO BOSS FASHIONS, INC. &
Hugo Boss USA, Inc., Plaintiffs–
Appellees–Cross–Appellants,**

v.

**FEDERAL INSURANCE COMPANY,
Defendant–Appellant–Cross–
Appellee.**

**Docket Nos. 00–7824(L), 00–7826(CON)
and 00–7884(XAP).**

United States Court of Appeals,
Second Circuit.

Argued Feb. 7, 2001.

Decided June 8, 2001.

Joseph K. Powers, Sedgwick, Detert, Moran & Arnold, NY, NY, for Defendant–Appellant–Cross–Appellee.

Mark I. Levy, Howrey Simon Arnold & White, LLP, Washington, DC (John E. Heintz, and John F. Stanton on the brief), for Plaintiffs–Appellees–Cross–Appellants.

Before: JACOBS, CALABRESI, and SOTOMAYOR, Circuit Judges.

CALABRESI, Circuit Judge:

This is an insurance coverage action arising out of defendant Federal Insurance Company's ("Federal") refusal to indemnify plaintiffs Hugo Boss Fashions, Inc. and Hugo Boss USA (collectively "HB USA" or "plaintiffs") and to pay for defense costs with respect to a suit brought against HB USA, and its parent company, Hugo Boss Germany ("HB Germany") by the Boss Manufacturing Company ("BMC"). (HB Germany is not a party to this suit. The term "Hugo Boss" will be used to refer to Hugo Boss USA, Hugo Boss Fashions, and HB Germany collectively.) BMC alleged that Hugo Boss's use of the term "BOSS" on certain products constituted trademark infringement and breach of contract. Federal disclaimed coverage on the grounds (1) that the suit against Hugo Boss fell into an "intellectual property" exclusion in its insurance contract, and (2) that the suit against Hugo Boss arose out of a breach of contract and that it, therefore, fell into a "breach of contract" exclusion in the insurance policy.

The district court (Harold Baer Jr., J.) granted partial summary judgment to plaintiffs. It found that the term "BOSS" fit into an exception (covering "trademarked slogans") carved out of the intellectual property exclusion, and that no other policy exclusion applied as a matter of law, though at least one—a "prior acts" exclusion—might ultimately be shown to be valid on the facts. Finally, the court held that Federal had violated its duty to defend Hugo Boss in the suit brought against it by BMC ("the BMC Action" or "the infringement suit").

A jury subsequently awarded HB USA $500,000 for the defense costs associated with the BMC Action, but denied any recovery for indemnification. The jury also concluded that Federal's failure to defend in the infringement suit constituted a breach of Federal's duty of good faith. Accordingly, the district court awarded HB USA approximately $644,000 in attorneys' fees and costs incurred in pursuing this action against Federal ("the coverage action").

On appeal, Federal challenges (1) the district court's grant of summary judgment to plaintiffs on the duty to defend, (2) the jury's conclusion that it acted in bad faith, and (3) the size of the award of attorneys' fees related to the coverage ac-

tion. HB USA cross-appeals, claiming (1) that the district court erroneously instructed the jury with respect to its claim for indemnification, and (2) that the jury award of $500,000 in fees and costs incurred during the infringement suit was inadequate as a matter of law.

We hold that the term "BOSS" cannot be deemed a "trademarked slogan," and, hence, that the "intellectual property" exclusion in the insurance contract applies. On this basis, we conclude that Federal had no duty to indemnify Hugo Boss. Because, however, at the time BMC's complaint against Hugo Boss was filed, there was uncertainty as to whether the exclusion would apply, a duty to defend existed. Finally, we hold that there was insufficient evidence of bad faith on Federal's part to support the jury's verdict against it on that count. Accordingly, the award of attorneys' fees and costs incurred by HB USA in pursuing the coverage action is vacated.

## BACKGROUND

Plaintiff Hugo Boss USA is a group of U.S.-based, wholly-owned subsidiaries of Hugo Boss Germany, which is a designer and manufacturer of expensive men's clothing and accessories. Hugo Boss USA holds the U.S. license for HB Germany's trademarks that appear on Hugo Boss products.[1] The Boss Manufacturing Company is a manufacturer of industrial and outdoor clothing and accessories such as shoes, boots, garden gloves, and mittens. Both BMC and Hugo Boss sell items bearing the term "BOSS."

### 1. The Concurrent Use Agreement

In 1988, BMC became concerned that Hugo Boss was infringing on certain BMC trademarks. This concern led the parties, in 1990, to enter into a Concurrent Use

Agreement ("the Agreement" or "the 1990 Agreement"), pursuant to which HB Germany agreed not to "sell or license others to sell gloves, mittens or boots with a mark that incorporates the word 'BOSS.'" The parties also agreed to "cross-license their marks for certain products at designated price points ... represent[ing] separate consumer markets." The purpose of this agreement was to establish guidelines that would prevent consumer confusion and would keep the parties from infringing each others' trademark rights.

### 2. The BMC Action

In 1997, BMC became suspicious that Hugo Boss was violating the Agreement. After confirming its suspicions by obtaining Hugo Boss gloves and boots with the term "BOSS" on them, BMC filed suit, in the United States District Court for the Southern District of New York, against HB Germany, Hugo Boss Fashions, and Hugo Boss USA. BMC brought claims (a) under the federal Trademark Act (Lanham Act), 15 U.S.C. §§ 1051 et seq., and under the common law, for trademark infringement and unfair competition, (b) under the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c), and under New York General Business Law §§ 360 et seq., for dilution, and (c) under the common law, for breach of contract.

BMC's Complaint alleged that Hugo Boss knew of the "goodwill represented and symbolized by the 'BOSS' mark," and that, Hugo Boss was "aware that the purchasing public recognizes and relies on this mark as identifying [BMC's] products, and distinguishing [BMC's] products from those of others." BMC contended that, in violation of the Agreement, Hugo Boss had "sold or licensed others to sell in the Unit-

---

1. Plaintiff Hugo Boss Fashions, Inc. holds the exclusive U.S. sublicense from Hugo Boss USA for HB Germany's trademarks in the United States and is the primary importer and distributor of Hugo Boss products.

ed States and its territories gloves, mittens, and boots which have a mark that incorporates the word 'BOSS.'" The Complaint also alleged that Hugo Boss had sold socks, T-shirts, and sweatshirts at prices below those permitted under the cross-licensing provisions of the Agreement.[2]

### 3. HB USA Seeks Coverage—The Insurance Contract

About three months after the Complaint in the BMC Action was filed, HB USA notified Federal—its insurer—of the suit, requested that Federal defend it in the BMC Action, and stated that it "will look to Federal for reimbursement of any indemnity payments it may be required to make" as a result of the suit. Federal had, previously, issued to HB USA an insurance policy providing general liability insurance, including insurance for "advertising injury" liability. The policy states:

> Subject to the applicable Limits Of Insurance, we will pay damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract for ... advertising injury ... caused by an offense committed during the policy period.

The policy defines "advertising injury" as injury "arising solely out of ... infringement of copyrighted advertising materials or infringement of trademarked or service marked titles or slogans," and makes clear that Federal "will have the right and duty to defend any insured against a suit seeking damages for ... advertising injury."

Of critical importance to this suit are a number of exclusions contained in the poli-

cy. First, an "intellectual property" exclusion states that:

> This insurance does not apply to ... advertising injury ... arising out of [conduct] ... which is claimed as an infringement, violation or defense of any of the following rights or laws: copyright, other than infringement of copyrighted advertising materials; patent; trade dress; trade secrets; or trademark or service mark or certification mark or collective mark or trade name, *other than trademarked or service marked titles or slogans.*

(emphasis added). Second, a "breach of contract" exclusion provides that: "This insurance does not apply to advertising injury arising out of breach of contract." Finally, a "prior acts" exclusion states: "This insurance does not apply to advertising injury ... arising out of oral or written publication of material whose first publication took place before the beginning of the policy period."

### 4. Federal Denies Coverage

Within Federal, the matter was referred to Mary Tycon, a regional supervisor who worked on advertising injury claims. Tycon concluded that Federal was not required to defend or indemnify Hugo Boss with respect to the BMC Action. She testified at trial that she reached this conclusion on a variety of different grounds. First, she determined that because the suit was for trademark infringement and because, in her view, "BOSS" did not constitute a "slogan" within the meaning of the policy, it fell within the intellectual property exclusion. "[O]ur understanding of slogan," Tycon explained, "was that it was a phrase with

---

**2.** In addition to seeking damages, BMC moved for a Temporary Restraining Order and a preliminary injunction prohibiting Hugo Boss from violating the Agreement and infringing its trademarks by selling boots, gloves, or mittens bearing the term "BOSS." The parties entered into a "Temporary Stipulated Order" that granted preliminary relief to BMC.

a secondary or a distinctive meaning, and BOSS did not constitute a phrase." Accordingly, she reasoned, the carve-out for "trademarked slogans" did not apply. Second, she noted that, in her view, whatever injury BMC had suffered, was not caused "in the course of advertising" and was, therefore, beyond the protections of the policy. Finally, Tycon concluded that "the allegations [in the Complaint] clearly said that there was an agreement which had been breached and that's what the lawsuit was based on, so it was our determination that [the breach of contract exclusion] would apply and would defeat coverage." Other Federal employees performed independent analyses of the policy and the BMC Complaint, and arrived at the same conclusions. Federal, therefore, decided to disclaim coverage, and a letter to Hugo Boss, explaining as much, was drafted.[3]

Before the letter was sent, however, Philip Hecht, an attorney representing HB USA, met with Federal to discuss his client's claim. Hecht explained to Federal that it was his opinion that "BOSS" constituted a "slogan" within the meaning of the policy. After this meeting, Federal decided to consult with outside counsel— the law firm of Nelson, Thompson, Pegue & Thornton (whom Federal regarded as experts in intellectual property and trademark matters)—to obtain a coverage opinion. Around this time, Hecht sent to Federal a letter referring to a case called *A Touch of Class Imports, Ltd. v. Aetna Casualty & Surety Co.*, 901 F.Supp. 175 (S.D.N.Y.1995), in which the United States District Court for the Southern District of New York held that the trademarked phrase "Touch of Class" constituted a slogan, and that, pursuant to an insurance

policy much like the one in this case, the defendant insurance company was obligated to provide coverage in an infringement suit.

In due course, Federal received an opinion from its outside counsel to the effect that Federal was not required to provide coverage in the BMC Action. As a result, and notwithstanding Hecht's letter and the decision in *A Touch of Class*, Federal wrote to HB USA informing the insured that Federal was disclaiming coverage for defense and indemnity on the grounds that (1) "BOSS" is not a slogan and so the "intellectual property" exclusion applies,[4] and (2) because the claim arose out of a breach of the Agreement, it fell within the "breach of contract" exclusion.

HB USA subsequently brought this action against Federal in New York State Supreme Court, asserting claims for breach of contract, breach of the implied duty of good faith and fair dealing, and breach of fiduciary duty. Subsequently, the case was removed to the United States District Court for the Southern District of New York, on the basis of diversity jurisdiction.

### 5. The BMC Settlement

On August 12, 1999, while the coverage action against Federal was still pending in the Southern District, the BMC Action was settled. Under the terms of the settlement agreement, HB Germany paid BMC $2 million, and HB Germany and BMC entered into a new Concurrent Use Agreement concerning use of the term "BOSS".

### 6. The Proceedings Below

Meanwhile, in the coverage action, Federal moved for summary judgment on a

---

3. Federal also concluded, later on, that it could disclaim coverage on the basis of the policy's "prior acts" exclusion.

4. The letter stated that "[a] slogan is a catch phrase used to advertise a product. No slogans are alleged."

variety of grounds including that: (1) the "intellectual property" exclusion applied because "BOSS" is not a slogan, (2) since BMC's claims arose out of Hugo Boss's breach of the 1990 Agreement, the "breach of contract" exclusion applied, (3) Federal did not breach its duty of good faith because the denial of coverage was based on a plausible reading of the policy, and (4) HB USA failed to show that the alleged injury occurred in the "course of advertising." HB USA cross-moved for partial summary judgment (on the duty to defend issue only) on the grounds that BMC's injuries arose out of Hugo Boss's advertising activities, that the "breach of contract" exclusion did not apply, and that, as a matter of law, "BOSS" qualifies as a slogan and so the exception to the intellectual property exclusion controlled.

On November 1, 1999, the district court issued a Memorandum and Order denying Federal's motion for summary judgment and granting plaintiffs' motion for partial summary judgment. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, No. 98 Civ. 6454(HB) 1999 WL 993689 (S.D.N.Y. Nov.1, 1999). First, the court held that the "breach of contract" exclusion did not apply. The court explained that, under New York law, for advertising injury to "arise out of" breach of contract, it must be the case that the claims of advertising injury would not exist *but for* the breach. *Id.* at *3. In this respect, the district court found that "[i]t is clear ... that BMC's claims against Hugo Boss do exist independent of the contract.... BMC's trademark rights arose long before it entered into the 1990 agreement with [HB Germa-

ny] and would exist even if BMC had never entered into that agreement...." *Id.*

As to the carve-out from the "intellectual property" exclusion for "trademarked slogans," the court below found that "'BOSS' in this context may qualify as a slogan." *Id.* at *4. The court noted that the dictionary defines a slogan as "an attention-getting device," and that "[t]he word 'BOSS' appears to do just that.... Indeed, unlike other tradenames such as Nike, McDonald's, or Ford, the word 'BOSS' itself conveys a meaning that the emblazoned products are of first-rate quality and that the wearer is 'above the rest' or 'in control.'" *Id.* Having previously noted that, under New York law, "'[i]f any of the claims against the insured arguably arise from covered events, the insurer is required to defend,'" *id.* at *2 (*quoting Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 667 N.Y.S.2d 982, 690 N.E.2d 866, 869 (1997)), the district court concluded that the possibility that "BOSS" might qualify as a slogan was sufficient to give rise to a duty to defend.[5]

During the subsequent trial, Federal filed a motion for judgment as a matter of law. It argued that, because HB Germany paid the legal fees associated with the BMC Action as well as the $2 million settlement, plaintiffs Hugo Boss Fashions and Hugo Boss USA had not sustained any loss that would entitle them to recovery. Federal also claimed that there was inadequate evidence of "bad faith" to support a jury verdict on that count. Before

---

**5.** The court also rejected Federal's contention that any injury to BMC was not caused by plaintiffs' "advertising activities." It stated that "the federal courts have held that the use of a trademark on goods implies or constitutes 'advertising' in 'the ordinary meaning of the term'.... This use qualifies as advertising under the definition [of the policy.]" *Hugo*

*Boss*, 1999 WL 993689, at *4 (alteration in original).

The court further determined that issues of fact existed as to whether Federal had acted in bad faith and had breached its fiduciary duties. These questions were, therefore, to be left to the jury. *Id.* at *5.

the trial court ruled on Federal's motion, however, the jury returned a verdict that: (1) awarded HB USA $500,000 on its duty to defend claim against Federal; (2) found that Federal was not required to indemnify HB USA for any of the $2 million settlement; and (3) determined that Federal had breached its duty of good faith and fair dealing.

HB USA subsequently moved for a new trial contesting (a) the amount of the jury's award with respect to Federal's duty to defend (HB USA claimed that upwards of $1.5 million, and not just $500,000 in damages, were in order), and (b) the jury's denial of indemnification. Also, in light of the jury's finding that Federal had breached its duty of good faith, HB USA sought attorneys' fees and costs incurred in prosecuting the coverage action.

In an Order dated June 5, 2000, the district court (1) denied HB USA's motion for a new trial, (2) awarded HB USA approximately $644,000 in attorneys' fees and costs associated with the coverage action, and (3) denied Federal's motion, made during trial, for judgment as a matter of law. This appeal and cross-appeal followed.

## DISCUSSION

■ There are three principal questions presented by this case, and very different presumptions attach to each one. First, we must determine whether Federal was required to indemnify HB USA for the $2 million settlement with BMC (or some fraction thereof).[6] As to this inquiry, we are guided by New York's well-established *contra proferentem* rule, pursuant to which unresolvable ambiguities in insurance contracts are construed in favor of the insured. *See, e.g., Handelsman v. Sea Ins. Co.*, 85 N.Y.2d 96, 623 N.Y.S.2d 750, 647 N.E.2d 1258, 1260 (1994) ("Where there is ambiguity as to the existence of coverage, doubt is to be resolved in favor of the insured and against the insurer."). Second, we must decide whether—even if, because of the existence of one or more policy exclusions, Federal ultimately had no duty to indemnify HB USA—Federal was nonetheless obligated to defend the insured until the applicability of the exclusions was determined. For these purposes, an even stronger presumption in favor of coverage exists. *See Hanover Ins. Co. v. Cowan*, 172 A.D.2d 490, 568 N.Y.S.2d 115, 116 (2d Dep't 1991) ("It is axiomatic that an insurance company's duty to defend is broader than its duty to indemnify.... [I]f the insurer is to be relieved of a duty to defend, it must demonstrate that the allegations of an underlying complaint place that pleading solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation."). Finally, we must assess whether there was sufficient evidence to support the jury's finding that Federal acted in bad faith when it declined to defend HB USA in the BMC Action. With respect to this question, in contrast to the other two, the presumption cuts powerfully against the insured, for under New York law "[i]t would require more than an arguable difference of opinion between carrier and insured over coverage to impose an extra-contractual liability for legal expenses.... It would require a show-

---

**6.** The author of this opinion would have certified to the New York Court of Appeals the question of whether Federal was obligated to indemnify HB USA. A majority of this panel, however, concluded that this question, though technically a matter of state law, is so closely bound up with important matters of federal trademark law as to make certification inappropriate. Accordingly, it is up to this court to determine, as best it can, the law of the State of New York in this regard. *See Siler v. Louisville and Nashville R.R. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909).

ing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it." *Sukup v. New York*, 19 N.Y.2d 519, 281 N.Y.S.2d 28, 227 N.E.2d 842, 844 (1967). We take up these questions in turn.

## I.

*The Duty to Indemnify*

Federal has consistently asserted that HB USA's indemnity claim is defeated by the "intellectual property" exclusion in its insurance contract. In this respect, Federal points out that (1) the intellectual property exclusion disclaims coverage for, *inter alia*, "advertising injury ... arising out of [conduct] ... which is claimed as an infringement [of] ... trademark ...," and (2) BMC's Complaint alleges "willful trademark infringement."

Plaintiffs, in contrast, emphasize that the policy carves out an exception to the intellectual property exclusion for injury "arising solely out of ... infringement of ... trademarked or service marked titles or slogans," and they insist that "BOSS" qualifies as a slogan within the meaning of the insurance contract. Plaintiffs argue that a "trademarked slogan" is a trademark that "conveys messages regarding characteristics of [a] product to the consumer," and that the term "BOSS" does exactly that. Appellees' Brief at 12. And, indeed, the district court agreed. In concluding that "BOSS" qualifies as a "trademarked slogan" within the meaning of the insurance policy, the court reasoned:

> English dictionaries generally define "slogan" as a word or combination of words that acts as an attention-getting device. The word "Boss" appears to do just that.... My finding on this score is bolstered by the fact that, contrary to Federal's position, "Boss" *does* suggest something about the nature or quality of BMC's products. Indeed, unlike other tradenames such as Nike, McDonald's,

or Ford, the word 'Boss' itself conveys a meaning that the emblazoned products are of first-rate quality and that the wearer is "above the rest" or "in control." Thus, although BMC uses the word 'Boss' to identify its products in the marketplace, it also attempts to distinguish these products by conveying ... a sense of power, style and quality.

*Hugo Boss*, 1999 WL 993689, at \*4. According to the district court and plaintiffs, then, because "BOSS" communicates to consumers a "secondary meaning," *i.e.,* something other than the identity of the product's source, it can be construed as a slogan.

Plaintiffs insist, moreover, that even if this court rejects the definition of "slogan" offered by the district court, and even if we ultimately conclude that "BOSS" does not constitute a "trademarked slogan," Federal should, nonetheless, be found liable. This is so, they claim, because the term "trademarked slogan" is, in the very least, ambiguous, and therefore, under New York's *contra proferentem* rule, Federal was obligated to provide full coverage.

■ But, of course, the *contra proferentem* does not come into play unless this court first determines that the contract is, in fact, ambiguous. *See Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 634 N.Y.S.2d 669, 658 N.E.2d 715, 717 (1995) ("The rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity.") And this court has explained that, under New York law, ambiguity does not exist "simply because the parties urge different interpretations." *Seiden Assocs. Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). Rather, "[t]he question of whether an insurance policy is ambiguous is a matter of law to be determined by the court." *Bd. of Mgrs. of Yardarm Condominium II v.*

*Fed. Ins. Co.*, 247 A.D.2d 499, 669 N.Y.S.2d 332, 332 (2d Dep't 1998).

■ In this respect, we have held that "[a]n 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987). Conversely, we have explained that "[c]ontract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282 (1978) (internal quotation marks omitted) (second alteration in original)).

As always, we begin with the terms of the contract itself to see if the intent of the parties can be gleaned without resort to extrinsic evidence. *See, e.g., W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990) ("A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."). In this case, however, the policy offers no explicit guidance; for nowhere in the lengthy insurance contract between Federal and HB USA—including the seven pages dedicated specifically to "Definitions"—is the term "trademarked slogan" explained. The policy fails to distinguish slogans from non-slogans, and, therefore, it is of no aid to us in deciding whether "BOSS" qualifies as a "trademarked slogan" within the meaning of the contract.

■ Nevertheless, the fact that the language of the contract itself does not specify the meaning of a disputed term does not entail that an ambiguity sufficient to trigger the *contra proferentem* exists. For it is quite possible that even where a contract does not define a particular—and potentially ambiguous—term, a body of state law or an established custom fills in the gaps left by the drafters. For example, when called upon to interpret the term "non-exclusive" in construing a contract, one court explained:

> [T]he word 'non-exclusive' when used— as was the case here—in an integrated license agreement drafted by legal counsel, *has an established legal meaning* that is usually accepted in the absence of a qualifying context, custom, usage or similar surrounding circumstance. The term *has repeatedly been defined* as meaning that the licensee is granted a bare right to use the trademark or patent being licensed without any right to exclude others, including other licensees taking from the grantor, from utilizing the mark or invention involved.

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968) (emphases added). The same applies when, instead of established state law, widespread custom or usage serves to determine the meaning of a potentially vague term. *See, e.g., Robinson v. United States*, 80 U.S. (13 Wall.) 363, 366, 20 L.Ed. 653 (1871) ("Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary."). When interpreting a state law contract, therefore, an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless the parties

explicitly indicate, on the face of their agreement, that the term is to have some other meaning. *See Eskimo Pie Corp.,* 284 F.Supp. at 994 (discussing defendant's contention that the parties intended the term "non-exclusive" to have a different meaning than that conventionally attributed to it under the law). By looking to these sources for guidance, a possible ambiguity may ultimately be proven to be illusory.

In this case, however, state law does not provide significant insight into the meaning of the term "trademarked slogan." For while there are New York cases that discuss slogan infringement, *see e.g., Hertz Corp. v. Avis, Inc.,* 106 A.D.2d 246, 485 N.Y.S.2d 51, 53 (1st Dep't 1985); *New York Trust Co. v. Believe It or Not, Inc.,* 12 Misc.2d 736, 178 N.Y.S.2d 12, 14 (Sup. Ct.N.Y.Cty.1958), they do not offer anything like a rigorous distinction between slogans and non-slogans. Indeed, the existence of any such distinction seems to have been totally irrelevant to these cases. Furthermore, neither these cases, nor the parties' submissions, demonstrates that there is an established industry usage of the term in question that might resolve the potential ambiguity.

■ Still, even under these conditions—where neither the contract nor state law defines a disputed term—a court may, nevertheless, find the term, as used in a state-law contract, to be unambiguous. For contracting parties operate against the backdrop not only of state law, but of *federal* law as well. And when federal law concepts, such as those relevant to trademark—paradigmatically a federal field—are employed, the parties may be read as having incorporated established meanings

and definitions forged in the relevant federal cases. *See Dolman v. United States Trust Co. of N.Y.,* 2 N.Y.2d 110, 157 N.Y.S.2d 537, 138 N.E.2d 784, 787 (1956) ("[U]nless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein...."). To be sure, because questions of contract interpretation are, generally, matters of state law, the States (like the parties) are empowered to define particular "federal" terms in ways that diverge from the definitions that control in the federal courts. But, where contracting parties use terms and concepts that are firmly rooted in federal law, and where there are no explicit signals to the contrary, we can presume that the prevailing federal definition controls. Moreover—and significantly, for purposes of this case and the *contra proferentem* rule—if the pertinent case law is ultimately read as defining the term with sufficient clarity, then the parties' use of that term in an agreement will not be deemed to create an ambiguity.

■ Such is the situation here. For while it is true that the contracting parties did not, and the New York cases do not, specify the meaning of the term "trademarked slogan," the federal case law does. And, the relevant federal cases indicate that "trademarked slogans" are phrases used to *promote or advertise* a house mark or product mark, in contradistinction to the house or product mark itself.[7] Indeed, *this* definition, and not the one suggested by the district court (pursuant to which words or phrases that convey "secondary meaning" constitute slogans), is sufficiently well-established that it has

---

7. The term "house mark" refers to a company name or line of products, while the term "product mark" refers to the name of a particular product. Thus, "Ford" is a house mark and "Mustang" is a product mark.

Similarly, "Kellogg's" is a house mark and "Pop Tarts" is a product mark. *See McCarthy on Trademarks and Unfair Competition* § 7:5 (4th ed.).

been taken as a given by the vast majority of federal courts.[8] Thus, the Seventh Circuit, in *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604 (7th Cir.1986), implicitly, though unambiguously, acknowledged the distinction between trademarked house or product names, on the one hand, and slogans or other kinds of trademarks, on the other. That court described a trademarked "slogan," together with a trademarked "combination of words and symbols[,] ornamental feature, [or] a distinctive shape," as "something ... intended to remind the consumer of the brand." *Id.* at 609; *accord Advanced Res. Int'l, Inc. v. Tri–Star Petroleum Co.*, 4 F.3d 327, 334 (4th Cir.1993) (same). It would be odd indeed to say that the trademarked *name* of a brand, product, or company constitutes a "trademarked slogan" merely because it "remind[s] the consumer of the brand." For under this definition, all house, product, or brand names would qualify as slogans. Thus, it seems clear that a "slogan" must be something, *other than the house mark or product mark itself*, that provides such a reminder.

In many other cases, the same unspoken, but nevertheless clear, assumption—that a "trademarked slogan" is a word or phrase used to promote house or product names, but is not the house or product name itself standing alone—is readily demonstrable. Thus, in *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1229 (7th Cir.1993), the Seventh Circuit noted that "Nike asserts JUST DO IT is its slogan, not the name of the business to which customers make checks payable in order to receive Nike products." And, in *American Express Co. v. CFK, Inc.*, 947 F.Supp. 310, 312 (E.D.Mich.1996), a district court said that "American Express developed an advertising campaign which featured the slogan, 'DON'T LEAVE HOME WITHOUT US.' According to the Company, this slogan was intended to encourage the public to use their [products] while traveling on business and pleasure." *See also Cont'l Scale Corp. v. Weight Watchers Int'l, Inc.*, 517 F.2d 1378, 1379–80 (C.C.P.A.1975) (noting that "[i]n connection with its 'HEALTH–O–METER' bath scales, petitioner ... has continuously used the slogan 'America's Weight Watcher Since 1919'"). Indeed, one federal court has explicitly acknowledged that "a slogan can only function as a separate trademark if it creates a separate impression from the house mark." *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F.Supp. 340, 346 (D.N.J.1996); *see also In re Nat'l Training Ctr. of Lie Detection*, 226 U.S.P.Q. 798,

---

8. We note, in passing, that the fact that the same district court judge, in the opinion below and in *A Touch of Class*, advanced a competing interpretation of the term "trademarked slogan" is not, in and of itself, sufficient to create an ambiguity, and hence to trigger application of the *contra proferentem* and a concomitant duty to indemnify. Instead, New York law is clear that the mere existence of a split in judicial authority is not sufficient to create contract ambiguity. Thus, in *Hartigan v. Casualty Co. of America*, 227 N.Y. 175, 124 N.E. 789, 790 (1919), the New York Court of Appeals explained:

The fact that the courts below have read the policy otherwise and found it susceptible of another meaning is urged as establishing the fact that reasonable and intelligent men may honestly differ as to its meaning, and that it must therefore be construed against the insurer. It is, however, for this court to say, as matter of law, whether reasonable men may reasonably differ as to such meaning, or whether the indulgence of the lower courts has not written a new contract for the parties and extended the defendant's liability beyond the plain and unambiguous language of the policy.

*See also Breed*, 413 N.Y.S.2d 352, 385 N.E.2d at 1282. It is precisely in a case such as this, where a single district judge offers an interpretation that runs against the overwhelming current of judicial opinion, that New York's rejection of a *per se* rule—under which ambiguity would exist whenever there is a split in judicial authority—is most apt.

799, 1985 WL 72086 (T.T.A.B.1985) (inquiring whether "the slogan create[s] a commercial impression separate and apart from the other material on the [product]").

In light of this federal authority confirming this definition of "trademarked slogan," and given the presumption that, unless they expressly indicate otherwise, contracting parties will be deemed to have incorporated into their agreements usages of key terms that are well-established in the case law or industry, we find no ambiguity sufficient to give rise to *contra proferentem* in this contract. By disclaiming coverage for advertising injury caused by trademark infringement, the policy in this case must be read to exclude from coverage any injury caused by an infringing use of the term "BOSS" alone.[9] And we interpret the carve-out for "trademarked slogans" as applying only to words or phrases used to *promote* particular products or product lines. "BOSS", the house name itself, does not qualify as such a word or phrase. Accordingly, HB USA's indemnity claim fails.[10]

## II.

*The Duty to Defend*

### A.

■ As we have already noted, under New York law, "the insurer's duty to furnish a defense is broader than its obligation to indemnify." *E.g., Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 486 N.Y.S.2d 873, 476 N.E.2d 272, 275 (1984).

Indeed, the New York cases establish that "[s]o long as the claims [asserted against the insured] may rationally be said to fall within policy coverage, *whatever may later prove to be the limits of the insurer's responsibility to pay,* there is no doubt that it is obligated to defend." *Id.* (alterations in original) (internal quotation marks omitted) (emphasis added). In other words, a separate, contractual duty to defend exists, and perdures until it is determined *with certainty* that the policy does not provide coverage.

■ There are at least three kinds of uncertainty that can give rise to such a duty to defend. The first is factual: did the injury occur in a time, place, or way that is covered by the policy? The second is legal: will the cases governing the insurance policy be read to impose coverage in a given situation? The third arises from the existence of *contra proferentem:* will the terms of the contract of insurance be deemed to give rise to an ambiguity that must be read against the insurer or will they be held to be clear enough to avoid the presumption? Each of these uncertainties will ultimately be resolved by courts or juries—and often in favor of the insurer, thereby precluding coverage and the duty to indemnify. But until they are, the insurer cannot avoid its duty to defend.

There are, of course, cases in which the policy is so clear that there is no uncertainty in fact or law, and hence no duty to defend.[11] And in cases where there is

---

9. Of course, if HB USA used the term "BOSS" as *part of* a phrase that constituted a slogan, such as BMC's "The Selection is Broad, the Quality is BOSS," then the insurance policy's carve-out for slogan infringement might well apply. Here, however, where it is alleged that the word "BOSS" alone was used in an infringing way, the carve-out does not come into play because the term does not "create[ ] a separate impression from the house mark." *Genovese Drug Stores,* 939 F.Supp. at 346.

10. Because we find that, as a matter of law, Federal was not obligated to indemnify HB USA for any of the $2 million settlement in the BMC Action, we need not take up plaintiffs' claim that the district court erroneously instructed the jury with respect to the "prior acts" exclusion in the insurance policy. Any such error was necessarily harmless.

11. The case before us, however, cannot be such a case. The existence of the prior district court decision in *A Touch of Class* makes

doubt as to the applicability of a policy to a claim, that uncertainty can be resolved long before the insurer has had to expend significant funds defending the insured in the underlying litigation.

Under some circumstances, the allegations contained in the complaint against the insured will by themselves eliminate all potential doubt and relieve the insurer of any duty to defend. Where, for example, a complaint alleges an intentional tort, and the insurance contract provides coverage only for harms caused by negligence, there would be no uncertainty as to the applicability of the policy exclusion, and hence, no duty to defend the particular suit brought.[12] *See, e.g., DiIorio v. Nat'l Union Fire Ins. Co.,* 262 A.D.2d 347, 691 N.Y.S.2d 568, 569 (2d Dep't 1999) ("The exclusion within the . . . policy for acts or injuries expected or intended by the insured precludes any liability on the part of [the insurer] on those causes of action."); *Brandstetter v. USAA Cas. Ins. Co.,* 163 A.D.2d 349, 558 N.Y.S.2d 562, 563 (2d Dep't 1990) ("Both of the [insurer's] policies have exclusionary clauses which state that the policy does not insure liability arising from injury or damage that is expected or intended by the insured. Since the plaintiff seeks coverage . . . for actions that are allegedly intentional, the exclusionary clauses apply as to both of [the] policies, and [the insurer] owes no duty to defend or indemnify the plaintiff in the underlying action."); *see also, e.g., George Muhlstock & Co. v. American Home Assurance Co.,* 117 A.D.2d 117, 502 N.Y.S.2d 174, 179 (1st Dep't 1986) ("[W]here the facts alleged plainly do not bring the case within the coverage of the policy, there is no obligation to defend.").[13]

In other cases, the duty to defend cannot be eliminated simply by examining the face of the complaint, but the insurer's responsibility to defend can, nonetheless, be determined before the underlying claim is resolved. Where, for instance, a complaint alleges harm caused by an insured's negligence in maintaining a building, and the insurance contract covers damages resulting from negligent mainte-

12. Except perhaps when there is some reason to believe that the suit can be converted into one based on the insured's negligence. *See Fitzpatrick v. Am. Honda Motor Co.,* 78 N.Y.2d 61, 571 N.Y.S.2d 672, 575 N.E.2d 90, 92 (1991) (concluding that the insurer has the responsibility of providing a defense when it has "actual knowledge that the lawsuit involves a covered event" even when this event is not alleged in the complaint).

13. In the case before us, however, the complaint in the underlying infringement action does not resolve the uncertainty as to coverage. Thus, though the BMC Complaint *itself* makes no reference to the term "BOSS" as a slogan, this does not mean that the complaint could not be read as alleging slogan infringement. Indeed, there is no reason at all to expect that BMC would specify as much in its complaint, because the question of whether that clear. If nothing else, that decision rendered *uncertain* the question of whether the courts would deem the term "trademarked slogan" to be unambiguous.

Hugo Boss's acts constituted infringement of a trademarked house or product name, on the one hand, or a trademarked slogan, on the other, was irrelevant to BMC's theory of recovery. *See Pahl v. Grenier,* 277 A.D.2d 681, 715 N.Y.S.2d 124, 126 (3d Dep't 2000) (finding a duty to defend notwithstanding the fact that the complaint in the underlying action did not help clarify whether the claim fell within the insurance policy because "that issue ha[d] no relevance to any of the causes of action pleaded in the complaint"). Moreover, nothing in BMC's Complaint negates the possibility that the allegations of trademark infringement come within the exception to the intellectual property exclusion for "trademarked slogans." *See Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1205–06 (2d Cir.1989) (finding duty to defend even though underlying complaint did not expressly allege that the harm was "sudden and accidental" as required by the exception to the relevant policy exclusion).

nance generally, but excludes damages due to negligent maintenance of elevators, if the complaint does not specify where in the building the injury occurred, there will be uncertainty as to whether coverage is required. A duty to defend will, therefore, exist. Not surprisingly, however, in such cases, New York law permits the insurance company to extricate itself early by demanding a bill of particulars. *See, e.g., Melito v. Romano*, 160 A.D.2d 1081, 553 N.Y.S.2d 893, 894–95 (3d Dep't 1990) ("[The insurer] demanded from plaintiff a bill of particulars seeking explication of the allegations [against the insured] in plaintiff's complaint."). As a result, the duty to defend lasts only until the factual ambiguity is resolved in favor of the insurer. *See Marine Midland Servs. Corp. v. Samuel Kosoff & Sons, Inc.*, 60 A.D.2d 767, 400 N.Y.S.2d 959, 962 (4th Dep't 1977) ("The insurer's duty to defend ... will end if, *and when,* it is shown unequivocally that the damages alleged are not covered by the policy.") (emphasis added).

Finally, there are situations in which a *legal* uncertainty as to insurance coverage gives rise to (an at least temporary) duty to defend. For example, where an insurance contract disclaims coverage for harms caused before sunset, and the term "sunset" is not defined in the insurance policy, even if a complaint against the insured states the exact time of day at which an injury was caused, it may be impossible to determine whether coverage exists. Once again, until the meaning of the term "sun-set" is established, a duty to defend exists. But, here too, the insurance company can readily protect itself, from having to defend for too long. Instead of a bill of particulars, it can seek a declaratory judgment with respect to the relevant policy exclusion, *i.e.,* as to the legal meaning of the word "sunset." And such suits are commonplace. *See, e.g., Progressive Cas. Ins. Co. v. Yodice*, 276 A.D.2d 540, 714 N.Y.S.2d 715, 716 (2d Dep't 2000) ("[A]n action, *inter alia,* for a judgment declaring that the plaintiff is not required to defend and indemnify the defendants"); *United Nat'l Ins. Co. v. Waterfront New York Realty Corp.,* 994 F.2d 105, 107 (2d Cir. 1993) ("[The insurer] agreed to defend [the insureds] ... but did so under a reservation of rights. [The insurer] then began the present actions against the insureds ... seeking a declaration that it owed no duty of defense or indemnification."). In this respect, the insurer's declaratory suit is an analogue to the "bill of particulars" the insurer seeks where the uncertainty is factual.[14]

 The case before us involves this kind of legal uncertainty (what does "trademarked slogan" mean?), as well as the additional legal question of whether the term was clear enough to avoid *contra proferentem.* It was, therefore, incumbent upon Federal to undertake a defense of Hugo Boss until the uncertainty surrounding the term was resolved. Had Federal

---

**14.** The defense coverage of a liability policy is owed in the interval required to sort out whether the underlying facts trigger liability coverage under the wording of the policy. Judge Sotomayor believes that the duty to defend lasts until the relevant underlying facts are settled, but that the duty does not even arise if the underlying facts are undisputed and the unsettled issue is the fit between those facts and wording in the policy later ascertained to be unambiguous. Thus Judge Sotomayor's dissent is based on the idea that policy wording is either ambiguous or not, and that this classification can be made without regard to a factual setting. This is a fallacy, because ambiguity is an insurance question that only arises in a factual setting. Judge Sotomayor's analysis would leave policyholders undefended while a good faith dispute ensues as to whether settled facts never seen before give rise to ambiguity as to coverage under a policy never before construed in the factual setting.

sought a declaratory judgment immediately upon Hugo Boss's filing of its insurance claim, a court might have eliminated this uncertainty by reading the term as Federal has claimed it should be read, and as we have done in this opinion. Moreover, it might have done so before Federal expended a great deal of money putting up a defense for Hugo Boss. But until such a ruling issued, the question of whether Federal might be held liable to indemnify Hugo Boss was in doubt. And, given this doubt, Federal's failure to provide a defense for Hugo Boss in the infringement suit was a violation of its contractual duties. Accordingly, we affirm the district court's conclusion that Federal was obligated to defend plaintiffs in the BMC Action.[15]

**B.**

We likewise affirm the jury's award of $500,000 in attorneys' fees and costs incurred in HB USA's defense against HB USA's cross-appeal that the award was manifestly inadequate, and that, as a result, its motion for a new trial with respect to damages was wrongly dismissed.

We review the district court's denial of a new trial for abuse of discretion. *See, e.g., Nat'l Communications Assoc. v. AT & T Corp.*, 238 F.3d 124, 127 (2d Cir.2001). "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of jus-

---

**15.** Federal advances other arguments, relying on other provisions of the insurance contract, in support of its contention that it was not obligated to defend HB USA in the BMC Action. None of these arguments is persuasive.

First, Federal contends that the "breach of contract" exclusion, which disclaims coverage for "advertising injury arising out of breach of contract," defeats plaintiffs' claim. But, as the district court properly found, this argument is foreclosed by the decision of the New York Court of Appeals in *Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.*, 88 N.Y.2d 347, 645 N.Y.S.2d 433, 668 N.E.2d 404 (1996). In that case, the Court of Appeals held that a "but for" test governs exclusion clauses such as the breach of contract exclusion at issue here. Thus, only if the advertising injury suffered by BMC would not exist *but for* the breach of contract, would the injury "arise out of" a breach of contract. And, only then would Federal not be obligated to indemnify HB USA. As the district court explained, however, "BMC's claims against Hugo Boss ... exist independent of the contract.... BMC's trademark rights arose long before it entered into the 1990 agreement with Hugo Boss [Germany] and would exist even if BMC had never entered into that agreement and/or if that agreement had not been breached." *Hugo Boss*, 1999 WL 993689, at *3.

The "breach of contract" exclusion is, perhaps, susceptible to readings other than the one outlined above. Nevertheless, because this reading is, at the very least, a possible one, sufficient uncertainty as to the applicability of the breach of contract exclusion existed so that it could not serve to eliminate Federal's duty to defend.

Federal also insists that because HB Germany, and not HB USA, paid the defense costs incurred by Hugo Boss as a result of the BMC Action and paid the $2 million settlement, HB USA did not incur any costs or damages as a result of that lawsuit. Accordingly, Federal argues, HB Germany is the "real party in interest" with respect to any costs relating to the BMC Action, and HB USA is not entitled to any recovery. Under New York's collateral source rule, however, "as a general rule, a plaintiff may recover damages that include amounts for which the plaintiff has already been compensated through sources wholly independent of and collateral to the wrongdoer." *Ideal Mut. Ins. Co. v. Korean Reins. Corp.*, 657 F.Supp. 1174, 1175 (S.D.N.Y.1987) (citing *Silinsky v. State–Wide Ins. Co.*, 30 A.D.2d 1, 289 N.Y.S.2d 541, 546 (2d Dep't 1968)). Thus, the fact that the parent company, rather than the subsidiary, paid the costs arising out of HB USA's infringing acts is of no moment, and HB USA's coverage action lies.

tice." *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.1998) (internal quotation marks omitted). "In reviewing the district court's denial of [a] new trial motion, we must view the evidence in the light most favorable to the nonmoving party...." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir.1999) (internal quotation marks omitted).

 HB USA argues that "[t]here was no legally sufficient evidence,—indeed no evidence whatsoever—on which the jury could reasonably reduce the amount of Hugo Boss's fees in the BMC litigation to anywhere near $500,000." [16] Given testimony presented at trial which suggested that BMC's claim might actually have been worth far less than the $2 million for which the parties settled—indeed, Hugo Boss's initial settlement offer was apparently $100,000—the jury might have reasonably concluded that the amount of the settlement reflects a payment by Hugo Boss not only for BMC's termination of the lawsuit, but also for an expansion of its rights under the Concurrent Use Agreement. And Federal is not obligated to pay attorneys' fees expended in securing this expansion of rights. Accordingly, and given our obligation to construe all evidence in the light most favorable to Federal, we conclude that the district court's denial of HB USA's request for a new trial was not an abuse of discretion.[17]

### III.

*The Duty of Good Faith and Fair Dealing*

 Federal also challenges the district court's denial of its motion for judgment as a matter of law with respect to HB USA's claim that Federal breached its duty of good faith and fair dealing when it failed to defend Hugo Boss in the BMC Action. Federal insists that, under New York law, which establishes a very strong presumption against bad faith liability in cases such as this, the jury's conclusion that it acted in bad faith lacked sufficient evidentiary support. We agree.

Because we uphold the jury's determination that HB USA was not entitled to indemnification from Federal, the refusal to indemnify cannot be a source of bad faith liability. Federal did, however, breach its duty to defend. And an insurance company could perfectly reasonably disclaim indemnity coverage and yet be in bad faith in refusing to defend until the scope of coverage was determined.

 Notwithstanding Federal's breach of its duty to defend, there remains a strong presumption in New York against a finding of bad faith liability by an insurer. *See Sukup*, 281 N.Y.S.2d 28, 227 N.E.2d at 844 ("It is ... well settled that an insured cannot recover his legal expenses in a controversy with a carrier over coverage, even though the carrier loses the controversy

---

**16.** HB USA acknowledges in its brief that the jury might have reduced the fee award by $12,000 for funds expended specifically in defense of HB Germany and by $200,000 for funds expended in hammering out the settlement with BMC. These were, according to HB USA, the only aspects of its request for $1,723,819.64 in fees with respect to which Federal took issue and submitted evidence. But even if the jury agreed with Federal on these points, the fee award could, HB USA claims, be reduced only to approximately $1.5 million and not below.

**17.** Because we affirm the district court's denial of a new trial, there is no reason for us to consider HB USA's claim that it was entitled to additur. Additur is an appropriate remedy only *in lieu* of a new trial. And without a threshold determination that a plaintiff is entitled to a new trial, the alternative remedy of additur is unavailable. *See, e.g., Liriano v. Hobart Corp.*, 170 F.3d 264, 272 (2d Cir.1999) ("Additur is a practice by which a judge offers a defendant *the choice* between facing a retrial and accepting a damage award higher than that determined by the jury.") (emphasis added).

and is held responsible for the risk."). The presumption against bad faith liability can be rebutted only by evidence establishing that the insurer's refusal to defend was based on "more than an arguable difference of opinion" and exhibited "a gross disregard for its policy obligations." *Id.*

We hold that the policyholder here has not adduced sufficient evidence, as a matter of law, to overcome the presumption. The insurer conducted a review of the coverage question, consulted with counsel, committed no overreaching, and did nothing more blameworthy than err. As in *Sukup,* "[t]he record shows merely an arguable case in which the carrier was held wrong. That is not enough to impose a liability beyond the terms of the contract." *Id.* Accordingly, the district court's denial of Federal's motion for judgment as a matter of law is reversed, and the judgment in HB USA's favor for $638,849.80 in fees and expenses, and $6,105.22 in costs, is vacated.[18]

## CONCLUSION

Federal trademark law makes unambiguously clear that a "trademarked slogan" is a word or phrase used to promote or advertise a house name or a product name. And the term "BOSS" is not such a word or phrase. Accordingly, we conclude that, in light of the intellectual property exclusion in HB USA's insurance policy, Hugo Boss's infringing use of that term did not give rise to a duty to indemnify on the part of Federal. Nevertheless, because it was not certain, at the time plaintiffs sought coverage from their insurer, that the contractual term "trademarked slogan" would be deemed by this court to be unambiguous, Federal was obligated to defend Hugo Boss in the underlying litigation until that uncertainty was resolved. Nevertheless, because the scope of the duty to defend in a case of legal-as against factual-uncertainty was not clear at the time Federal declined to defend Hugo Boss, we hold that Federal did not breach its implied duty of good faith in failing to defend Hugo Boss.

The district court's grant of partial summary judgment to HB USA on the duty to defend is, therefore, AFFIRMED, as is the jury's award of $500,000 in damages with respect to the breach of that duty. The denial of any damages for indemnification is also AFFIRMED. However, the district court's denial of judgment as a matter of law with respect to plaintiffs' claim of bad faith is REVERSED and the award of fees and costs incurred in the coverage action is VACATED. Each party will bear its own costs.

Judge SOTOMAYOR, dissents in part in a separate opinion.

SOTOMAYOR, Circuit Judge, dissenting in part:

I am in agreement with the majority on all matters except the duty to defend. The majority holds that even when an insurance policy exclusion unambiguously denies coverage, an insurer will need to defend a suit whenever it is "uncertain" that this Court would have concluded that the policy exclusion was unambiguous. *Ante* at 620–23. Because I find no such requirement in New York law, I respectfully dissent from Part II.A. of the majority's opinion.[1]

---

18. Given our holding with respect to the duty of good faith and fair dealing, it is, of course, unnecessary for us to take up Federal's claim, that, if attorneys' fees are to be awarded, plaintiffs are entitled to only a fraction of the money awarded, due to its limited success in the coverage action.

1. In view of the panel's failure to agree on the status of New York law on this issue, I would have certified this question to the New York Court of Appeals.

This panel has unanimously found that the intellectual property exclusion at issue unambiguously denies indemnification for BMC's claims against HB USA. *Ante* at 619–20. We found this exclusionary clause unambiguous despite a district court opinion from this circuit stating contrary views regarding the relevant legal terms because "New York law is clear that the mere existence of a split in judicial authority is not sufficient to create contract ambiguity." *Ante* at 619 n. 8. An unambiguous policy exclusion demonstrates the will of the parties to deny coverage of the excluded liabilities. *See Morlee Sales Corp. v. Mfrs. Trust Co.,* 9 N.Y.2d 16, 210 N.Y.S.2d 516, 172 N.E.2d 280, 282 (1961) ("[A] contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed."). Nevertheless, the majority finds that Federal still had a duty to defend HB USA "because it was not certain, at the time plaintiffs sought coverage from the insurer," that the exclusionary clause "would be deemed by this court to be unambiguous." *Ante* at 625. The majority cites no case, and I have found none, in which a court has imposed the duty to defend despite the unambiguous language of an insurance policy excluding coverage.

The majority's attempt to establish a two-tiered standard for legal clarity—requiring "unambiguous" legal terms to disclaim the duty to indemnify, but requiring unambiguous legal terms that courts will recognize with certainty to disclaim the duty to defend—finds no basis in New York law. New York courts pursue the same inquiry into the objective clarity of policy terms regardless of whether the duty to defend or the duty to indemnify is at stake.

Concerning the duty to indemnify, a policy term is "ambiguous," as the majority notes, if it is "capable of more than one meaning when viewed objectively by a rea-sonably intelligent person," *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987), and, conversely, it is unambiguous if "there is no reasonable basis for a difference of opinion" as to its meaning. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280,1282 (1978)). In this regard, the majority finds that a contrary view of the law expressed in *A Touch of Class Imports, Ltd. v. Aetna Cas. and Sur. Co.,* 901 F.Supp. 175 (S.D.N.Y.1995), does not create an ambiguity. *Ante* at 619 n. 8.

Turning to the duty to defend, New York courts have similarly relied on an objective measure of the reasonableness of a policy interpretation to determine coverage. *See Cont'l Cas. Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 512 (1993) ("To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is … subject to no other reasonable interpretation…."); *Seaboard Sur. Co.,* 486 N.Y.S.2d 873, 476 N.E.2d at 275 ("[S]o long as the claims [asserted against the insured] may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay, there is no doubt that it is obligated to defend.") (internal quotation marks omitted). Accordingly, the duty to defend is affected no more than the duty to indemnify by a contrary finding in *A Touch of Class. See Breed,* 413 N.Y.S.2d 352, 385 N.E.2d at 1283 (rejecting the proposition that a "'split' in Judges and in courts and even [in] the combined judicial and legal experience of those who have reviewed this matter and arrived at different results" is necessarily indicative of an "ambiguous" exclusionary clause).

The uniformity in the standards used to judge the clarity of policy terms for both the duties to indemnify and defend is demonstrated by New York cases that determine both duties with reference to whether the policy terms are "ambiguous." In a suit involving the duty to defend, the New York Court of Appeals found, for example, that "[i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured against the insurer." *Westview Assocs. v. Guar. Nat'l Ins. Co.*, 95 N.Y.2d 334, 717 N.Y.S.2d 75, 740 N.E.2d 220, 223 (2000). Other courts interpreting New York law have similarly judged the clarity necessary to establish the scope of coverage under a single legal standard despite the fact that two different legal duties were at issue.[2]

The majority errs in confusing two types of uncertainty. The first is cognizable under New York law, the second is not. The first concerns the period during which the underlying action is pending when the insurer must defend the insured against any allegations that, if proven, would result in indemnification. This type of uncertainty is a well-established element of New York insurance law and is unquestioned here. The majority attempts to read a second category of "uncertainty" into New York law, however, concerning how a court might rule on the scope of policy terms. No such "uncertainty" is recognized under New York law apart from that arising from an "ambiguous" policy term.

Beginning with the first category of uncertainty, it is undisputed that unproven allegations may trigger the duty to defend. This is because "[t]he duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability . . . ." *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 488

---

**2.** *See, e.g., McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 112–13 (2d Cir.1994) (applying New York law) (vacating judgment that insurer had no duty to defend after finding insurance policy exclusion was "ambiguous"); *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 107 (2d Cir.1993) (applying New York law) (relieving insurer of duty to defend and duty to indemnify finding that "[t]he primary question presented is whether the assault and battery exclusion is ambiguous" and that "[a]n ambiguity is present only where each of the competing interpretations is objectively reasonable"); *Bd. of Managers of Yardarm Condo. II v. Fed. Ins. Co.*, 247 A.D.2d 499, 669 N.Y.S.2d 332, 333 (2d Dep't 1998) (relieving insurer of duty to defend and duty to indemnify after determining insurance contract terms were unambiguous); *Hartford Ins. Co. of the Midwest v. Halt*, 223 A.D.2d 204, 646 N.Y.S.2d 589, 594 (4th Dep't 1996) (relieving insurer of duty to defend and duty to indemnify finding, despite split in judicial authority, that "where the provisions of an insurance contract are clear and unambiguous, they must be enforced as written"); *Direct Travel v. Aetna Cas. and Sur. Co.*, 214 A.D.2d 484, 625 N.Y.S.2d 221, 222 (1st Dep't 1995) (relieving insurer of duty to defend and duty to indemnify finding "[t]here was no ambiguity in the declarations page of the primary policy with respect to professional liability coverage"); *Pergament Distribs., Inc. v. Old Republic Ins. Co.*, 128 A.D.2d 760, 513 N.Y.S.2d 467, 468 (2d Dep't 1987) (relieving insurer of duty to defend and duty to indemnify explaining that "[a]lthough it is true that any ambiguity in an insurance contract must be resolved in favor of the insured, the court should not strain itself to find an ambiguity where words have a definite and precise meaning"); *Bianco v. Travelers Ins. Co.*, 99 A.D.2d 629, 472 N.Y.S.2d 184, 185 (3d Dep't 1984) ("Since the exclusion is clear and unambiguous, and since the meaning of its wording, as understood in the plain, ordinary, and popular sense, applies to the undisputed facts of this case . . . defendant has no duty to defend."); *J.G.A. Constr. Co. v. Charter Oak Fire Ins. Co.*, 66 A.D.2d 315, 414 N.Y.S.2d 385, 387 (4th Dep't 1979) (relieving insurer of duty to defend and duty to indemnify finding that "if the policy is ambiguous, the ambiguities (particularly those found in an exclusionary clause) are construed against the insurer").

N.Y.S.2d 139, 477 N.E.2d 441, 444 (1985). Thus, even if the insurer is convinced that any allegations that would bring the claim within the policy's coverage are without merit, the insurer must continue to assume that the plaintiff can prove facts supporting these allegations that "fall within the risk covered by the policy." *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319, 321 (1975) (internal quotation marks omitted); *see also Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 486 N.Y.S.2d 873, 476 N.E.2d 272, 275 (1984) ("[T]he duty of the insurer to defend the insured rests solely on whether the complaint alleges any facts or grounds which bring the action within the protection purchased."). Until this assumption is disproved, the ability of an insurer to avoid indemnification is not "certain," and the duty to defend continues to attach. The oft-repeated maxim that "the insurer's duty to furnish a defense is broader than its obligation to indemnify," *Seaboard Sur. Co.*, 486 N.Y.S.2d 873, 476 N.E.2d at 275, remains true because what a plaintiff alleges is often broader than what it can prove.[3]

Doubt as to what the insurance policy means is a different issue. When, as here, the policy contains a legal term, *i.e.* "trademarked slogans," the determination of whether this term was unambiguous at the time the parties signed the policy does not require a final determination of liability. Moreover, a decision that the policy term is "unambiguous" does not prospectively clarify what had been unclear, but merely retrospectively ascertains that the law was unambiguous at the time that the policy was signed. In order to determine its duties under a policy, insurers are, as a matter of course, called upon to survey the relevant law and scrutinize the language of the policy to judge whether its terms are unambiguous. Insurers may err in their judgment concerning the unambiguity of a policy term but are given strong incentives to decide these questions correctly. If they do not, they can be forced to defend a costly coverage action or, if the finding of unambiguity was so far off the mark that "no reasonable [insurance] carrier would, under the given facts, be expected to assert it," *Sukup v. State*, 19 N.Y.2d 519, 281 N.Y.S.2d 28, 227 N.E.2d 842, 844 (1967), insurers can face even greater liabilities for breaching their duty of good faith.

All of this assumes that we entrust insurers with the initial decision concerning whether policy terms are unambiguous. In the case of a policy that uses a legal term of art, this inquiry requires a determination of whether that term of art is unambiguous. The rule that the majority correctly takes from the New York Court of Appeals "that the mere existence of a split in judicial authority is not sufficient to create contract ambiguity," *ante* at 619 n. 8, is not meant to be applied only by courts, but also by insurers and anyone else who seeks to determine what the law is. The irony is that the majority agrees with Federal's assessment that, at the time the parties entered into this policy, the term "trademarked slogan" did not include a house mark like "Boss" because, as we

---

**3.** In this regard, the majority misstates my position as advocating a decision on whether the policy is unambiguous "without regard to a factual setting." *Ante* at 622 n. 14. All of these issues arise only upon the filing of a complaint against the insured. The insurer then lays the complaint, alleging certain facts and making various legal claims, alongside the policy to determine whether these claims fall within the coverage of the policy. This is no less true for a "never seen before" set of facts that a complaint may allege. *See ante* at 622 n. 14. To decide whether it must defend the action, the insurer will, in all cases, assume that the facts are true and proceed to determine whether the policy unambiguously excludes coverage for the claims alleged.

explain, trademark law employs the term "trademarked slogan" to refer to a word or phrase used to advertise a house or product mark.[4] This elemental observation regarding trademark terminology was no less clear to Federal in interpreting HB USA's coverage as it was to this Court in deciding this case. And yet, the majority wants to deny Federal the opportunity to reach the same conclusion we have reached. It is difficult to understand why we should discourage Federal or any other insurer from making such determinations that are, in any case, subject to review and even sanction if erroneous.

I expect that considerable difficulties await those who try to respond to the majority's invitation to predict when it is "uncertain" that this Court, or any court, will recognize an unambiguous policy provision for what it is. Some may find it hard, as I do, to comprehend how it could ever be "uncertain" that this Court would recognize that an unambiguous policy exclusion is, in fact, unambiguous. For others who take up the task of defining "certainty" apart from and beyond the high standard of unambiguity, the majority offers no guidance. Followed to its logical

limits, the only "certainty" as to New York law would come from the New York Court of Appeals ruling on the meaning of the same legal term within the context of the precise facts at issue, an unlikely prospect. For purposes of the duty to defend, this would effectively render the unambiguity of a policy's exclusionary clause a nullity until such time as the New York Court of Appeal decides an identical case.[5]

I find no support for this expansion of the duty to defend and, therefore, respectfully dissent from the majority's affirmance of the district court's grant of partial summary judgment to HB USA on the duty to defend and corresponding award of damages.

---

4. Additional evidence that trademark law rejects Hugo Boss's bi-polar categorization of trademarks into slogans and non-slogans is found in the precedents of this Circuit. Under established trademark nomenclature, dual meaning words or phrases are known as "descriptive," or "suggestive" trademarks, and protectable house or product names without a dual meaning are described as "arbitrary" or "fanciful." *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142–43 (2d Cir. 1997). The notion that these distinctions could be captured by reference to the slogan/non-slogan distinction is completely foreign to the manner in which our law identifies trademarks and affords them protection.

The law of this Court would also reject Hugo Boss's grouping of "Nike," "McDonald's," and "Ford" into a single category

of trademarks that do not "convey[ ] a meaning." In contrast to the "fanciful" trademark "Nike," we have found that trademark protection is extended to "descriptive" surnamed house marks such as "McDonald's" or "Ford" on the basis of their distinctiveness and secondary meaning. *See Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir.1990).

5. The majority correctly states that an insurer's responsibility to defend an action can be determined before the underlying claim is resolved by means of a declaratory judgment. *Ante* at 622. Nevertheless, the fact that this novel duty of "certainty" may be resolved by means of a separate legal action will be of little comfort to those who must assume the costs of this additional litigation in order to determine whether they are free of an obligation found nowhere in New York law.