16-2812-cv
Beazley Insurance Co. v. Ace American Insurance Co.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: August 23, 2017                    Decided: January 22, 2018)

Docket No. 16-2812-cv

_____

BEAZLEY INSURANCE COMPANY, INC.,

*Plaintiff-Appellant*,

v.

ACE AMERICAN INSURANCE COMPANY,
ILLINOIS NATIONAL INSURANCE COMPANY,

*Defendants-Appellees*.

_____

Before: POOLER and LYNCH, *Circuit Judges*, and COGAN, *District Judge*.[1]

The NASDAQ public stock exchange conducted the initial public offering for Facebook, Inc. NASDAQ encountered a variety of technical difficulties in executing the IPO that resulted in trades not being performed properly. Retail

_____

[1] Judge Brian M. Cogan, of the United States District Court for the Eastern District of New York, sitting by designation.

investors sued NASDAQ, and those claims were eventually settled for $26.5 million.

NASDAQ maintained both errors and omissions ("E&O") and directors' and officers' ("D&O) insurance policies. Appellant Beazley Insurance Company was the second-level E&O carrier; appellees ACE American Insurance Company and Illinois National Insurance Company were the first and second level D&O carriers, respectively. ACE and Illinois National disclaimed coverage under the D&O policies. Beazley paid out its policy limit of $15 million in E&O coverage subject to an agreement with NASDAQ in which NASDAQ assigned Beazley its contractual rights against ACE and National. Beazley then sued ACE and National for coverage under D&O policies.

The United States District Court for the Southern District of New York (Rakoff, *J.*) ultimately granted ACE and Illinois National summary judgment. *Beazley Ins. Co. v. ACE Am. Ins. Co.*, 197 F. Supp. 3d 616 (S.D.N.Y. 2016). The district court found that (1) retail investors in Facebook were unambiguously "customers" of NASDAQ; (2) the underlying securities claims against NASDAQ arose out of NASDAQ's provision of professional services; and (3) thus, the claims were excluded from coverage pursuant to the D&O policy's professional services exclusion.

Affirmed.

_____

KEVIN KIEFFER, Troutman Sanders LLP (Ryan C. Tuley, *on the brief*), Irvine, CA *for Plaintiff-Appellant Beazley Insurance Co., Inc.* .

JONATHAN D. HACKER, O'Melveny & Myers LLP (Bradley N. Garcia, *on the brief*), Washington, DC, *for Defendant-Appellant Ace American Insurance Company.*

ALEXANDER S. LORENZO, Alston & Bird LLP, New York, NY, *for Defendant-Appellant Illinois National Insurance Company.*

POOLER, *Circuit Judge*:

The NASDAQ public stock exchange conducted the initial public offering for Facebook, Inc. NASDAQ encountered a variety of technical difficulties in executing the IPO that resulted in trades not being performed properly. Retail investors sued NASDAQ, and those claims were eventually settled for $26.5 million.

NASDAQ maintained both errors and omissions ("E&O") and directors' and officers' ("D&O") insurance policies. Appellant Beazley Insurance Company was the second-level E&O carrier; appellees ACE American Insurance Company and Illinois National Insurance Company were the first and second level D&O carriers, respectively. ACE and Illinois National disclaimed coverage under the D&O policies. Beazley paid out its policy limit of $15 million in E&O coverage subject to an agreement with NASDAQ in which NASDAQ assigned Beazley its contractual rights against ACE and National. Beazley then sued ACE and National for coverage under D&O policies.

3

The United States District Court for the Southern District of New York (Rakoff, *J.*) ultimately granted ACE and Illinois National summary judgment. *Beazley Ins. Co. Inc. v. ACE Am. Ins. Co.*, 197 F. Supp. 3d 616 (S.D.N.Y. 2016). The district court found that (1) retail investors in Facebook were unambiguously "customers" of NASDAQ; (2) the underlying securities claims against NASDAQ arose out of NASDAQ's provision of professional services; and (3) thus, the claims were excluded from coverage pursuant to the D&O policy's professional services exclusion. We agree with the district court that federal securities law makes clear that retail investors in company stock are "customers" of NASDAQ within the meaning of the insurance policies at issue. We also agree that the claims in the underlying complaint arose out of the provision of "professional services," as plaintiffs could not prevail without demonstrating that their losses flowed from NASDAQ's failure to properly process their trades. We thus affirm the district court's grant of summary judgment on the issue of indemnification.

## BACKGROUND

NASDAQ is a public stock exchange that provides an electronic trading platform on which its members, registered broker-dealers, execute securities transactions. *See NASDAQ OMX Group, Inc. v. UBS Sec. LLC*, 770 F.3d 1010, 1013-

4

14 (2d Cir. 2014). Members trade on NASDAQ both on their own behalf, and on behalf of retail investors. *See id.*

As relevant here, NASDAQ maintained two stacks, or towers, of insurance coverage. NASDAQ purchased a tower of E&O coverage from Chartis Specialty Insurance Company, Beazley and ACE. Chartis provided primary coverage of $15 million, above a $1 million self-insured retention, for all "[d]amages resulting from any Claim . . . for any Wrongful Act of the Insured" that "occur[ed] . . . solely in rendering or failing to render Professional Services." App'x at 204. The Beazley E&O policy provided excess coverage with another $15 million in coverage, and "follow[ed] form" to Chartis' policy, that is, provided coverage on the same terms. App'x at 192. ACE's policy provided second level excess insurance, with a $15 million limit after the Chartis and Beazley policies were exhausted. **[App'x 177]** Altogether, NASDAQ purchased $50 million in E&O coverage.

NASDAQ also purchased a tower of D&O coverage from ACE and Illinois National. The ACE D&O policy was primary and provided $15 million in coverage after a $2 million self-insurance retention for liability incurred by certain officers and directors for any "[w]rongful [a]cts." App'x at 1624. The ACE

5

D&O also provided coverage to NASDAQ for any losses NASDAQ became obligated to pay "by reason of a Securities Claim . . . for any Wrongful Acts." App'x at 1624. The ACE D&O policy also contained a "professional services exclusion" that provided that ACE "shall not be liable for Loss on account of any Claim . . . by or on behalf of a customer or client of the Company, alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services." App'x at 1628, 1653. Illinois National issued an excess policy for an additional $15 million in coverage that follows form with the ACE D&O policy.

NASDAQ carried Facebook's initial public offering on May 18, 2012. It did not go smoothly—NASDAQ's trading platform suffered a series of technical failures, resulting in the improper processing of orders to buy and sell stock. Retail investors in Facebook sued NASDAQ, alleging that they suffered losses as a result of NASDAQ's technical failures. In all, more than 40 lawsuits related to the Facebook IPO were brought against NASDAQ across the country, and were eventually consolidated in the Southern District of New York.

After consolidation, plaintiffs filed a consolidated amended class action complaint (the "CAC") against NASDAQ and two NASDAQ officers: Robert

6

Greifeld, then-president and chief executive officer; and Anna Ewing, then-chief information officer (collectively, "NASDAQ"). The CAC, filed in April 2013, was brought on behalf of a putative class of all persons who entered orders to buy or sell Facebook's common stock on May 18, 2012 and lost money as a result of NASDAQ's alleged wrongdoing. The CAC asserted securities fraud claims pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as state law negligence claims.

NASDAQ provided notice of the CAC to each insurer. Chartis accepted potential coverage under its E&O policy subject to a reservation of rights, as did Beazley and ACE. However, both ACE and Illinois National disclaimed coverage under the D&O policies, relying on the "professional services" exclusion in the ACE policy. Neither NASDAQ nor its broker challenged the disclaimer. NASDAQ renewed the D&O policy twice without ever raising the issue.

NASDAQ agreed to settle the CAC in April 2015 for $26.5 million, and sought coverage under its E&O tower to pay for both the settlement and NASDAQ's defense costs. Chartis paid out its $15 million, and ACE paid out $4.9 million under its third-level E&O policy. Because Chartis and ACE were responsible for the cost of defending the lawsuits, the claim cost them more than

7

the $26.5 million settlement figure. Beazley also paid out its full $15 million pursuant to an agreement in which NASDAQ "assign[ed] to Beazley any and all contractual rights or extra-contractual rights they have or that they may acquire . . . against ACE and/or Illinois National in connection with the [CAC] up to the amount of [$15 million]." App'x at 4101. The agreement also provided that NASDAQ would not take "any formal position with regard to the availability of coverage under the ACE D&O Policy and/or the [Illinois National policy] for the claims asserted in the" CAC, and that NASDAQ would "not voluntarily provide any testimony or declaration in connection with any proceeding between Beazley on the one hand and ACE and/or Illinois National on the other arising out of or related to the" CAC. App'x at 4128.

Beazley then attempted to get ACE to reconsider its denial of coverage, and when those efforts were unsuccessful, sued for coverage under the D&O policies in June 2015. In July 2015, Beazley moved for partial summary judgment seeking a declaration that ACE had an obligation to provide a defense. The district court granted the motion, noting:

> On balance, the Court is in agreement with Beazley that interpreting "customer [s] or client[s]" to exclude retail investors in a public company listed on NASDAQ is at

8

least one reasonable interpretation of the ACE D&O Policy. As a consequence, ACE has failed to satisfy its "heavy burden of demonstrating that . . . the [Professional Services] exclusion is subject to no other reasonable interpretation" than the one it has proffered to disclaim coverage, and ACE was therefore obligated to provide NASDAQ with defense costs coverage in connection with NASDAQ's defense of the CAC.

*Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 150 F. Supp. 3d 345, 353 (S.D.N.Y. 2015).

However, the district court cabined its holding:

To be clear, the Court is not interpreting "customer[s] or client[s]" to exclude retail investors as a matter of law, as that is not the relevant question for purposes of plaintiff's motion. Defendants are free, with the benefit of discovery, to renew their arguments as to the meaning of "customers or clients" on summary judgment.

*Id*. at n.9.

Following discovery, in January 2016 Beazley moved for partial summary judgment seeking a declaration that ACE had a duty to indemnify in connection with the CAC settlement. ACE and Illinois National cross-moved for summary judgment on the remaining claims. The district court denied Beazley's motion, granted ACE and Illinois National's motion and also found ACE liable for unreimbursed attorneys' fees and costs reasonably incurred by NASDAQ in excess of the policy's $2 million retention. This appeal followed.

9

**DISCUSSION**

"We review orders granting summary judgment de novo." *Hizam v. Kerry*, 747 F.3d 102, 107 (2d Cir. 2014). The parties are in agreement that New York law applies to their dispute. ACE based its disclaimer on the D&O policy's professional services exclusion, which provides that:

> The Insurer shall not be liable for Loss on account of any Claim . . . by or on behalf of a customer or client of the Company [i.e., NASDAQ], alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services.

App'x at 1628, 1653. The D&O policy defines neither "customer or client" nor "professional services." Beazley argues that the district court erred in enforcing the exclusion because (1) the retail investors who sued and settled the CAC are not customers or clients within the meaning of the D&O policy, and (2) the claims settled in the CAC are not "alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services." The burden of proving the exclusion applies rests with the insurer. *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009).

"The law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds." *Id.* at 306 (internal quotation marks

10

omitted). Policy exclusions are enforced only when they "have a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Id*. at 307. Thus:

> [W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language. Any such exclusions or exceptions from policy coverage must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction.

*Id*. (citation omitted).

### I. Customers and clients

"[A]n insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (citation omitted). "[W]e begin with the terms of the [policy] itself to see if the intent of the parties can be gleaned without resort to extrinsic evidence." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001).  Here, as in *Hugo Boss*, the policy fails to define "customers" or "clients."  As is relevant here,

11

*Hugo Boss* teaches that a court may find a policy term unambiguous where that term has a clear meaning in federal law.

In the absence of guidance from the policy language, courts ask whether a body of law or an established custom or usage provides a definition. "For it is quite possible that even where a contract does not define a particular—and potentially ambiguous—term, a body of state law or an established custom fills in the gaps left by the drafters." *Id.* *Hugo Boss* makes clear that federal law can similarly serve to fill such a gap:

> [U]nder these conditions—where neither the contract nor state law defines a disputed term—a court may, nevertheless, find the term, as used in a state-law contract, to be unambiguous. For contracting parties operate against the backdrop not only of state law, but of *federal* law as well. And when federal law concepts, such as those relevant to trademark—paradigmatically a federal field—are employed, the parties may be read as having incorporated established meanings and definitions forged in the relevant federal cases.

*Id*. at 618.

The district court properly relied on custom and usage of the terms "customers" in determining that the retail investors were "customers" of NASDAQ within the meaning of the ACE D&O policy. Similar to trademark law, securities law is "paradigmatically a federal field." *Id.* "In assessing whether

12

there is [] a prevailing federal definition, we consider not whether there is complete unanimity among the courts that have addressed the question, but rather whether there is an overwhelming current of judicial opinion, that is, a meaning used by the vast majority of federal courts." *CGS Indus. Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 78 (2d Cir. 2013) (internal quotation marks omitted).

We have little trouble finding that the vast majority of federal courts to consider the issue find retail investors to be "customers" of a stock exchange. In *Lank v. New York Stock Exchange*, our Court held that "[t]he primary purpose of the Exchange Act was to *protect customers of the stock exchanges that is, public investors*." 548 F.2d 61, 64 (2d Cir. 1977) (emphasis added). "One method of effectuating this was to impose on the exchanges a statutory duty to protect investors by regulating (the exchanges') members." *Id*. (citation and internal quotation marks omitted). District courts also regularly characterize retail investors as "customers" of stock exchanges. *See, e.g., Matter of Lake States Commodities, Inc.*, 936 F. Supp. 1461, 1469 (N.D. Ill. 1996) ("[T]he Second Circuit [has] construed the NYSE constitution and rules as intending to provide customers of the exchange with the right to force members into arbitration over disputes"), abrogated on other grounds by *Damato v. Hermanson*, 153 F.3d 464

13

(7th Cir. 1998*); Carr v. New York Stock Exch., Inc.*, 414 F. Supp. 1292, 1298 (N.D. Cal. 1976) ("In enforcing its rules and in making complex decisions on the suspension or forced liquidation of members, the Exchange must consider the often conflicting interests of the member firm, its partners, and investors, and the corporations whose securities are handled by the firm, as well as the Exchange's public customers."); *New York Stock Exch., Inc. v. Sloan*, 1980 WL 1431, at *3 (S.D.N.Y. Aug. 15, 1980) ("[The New York Stock Exchange's] right to relief is predicated upon its subrogation to the rights of its customers."). It appears most federal courts take the meaning of "customer" in this context "as a given." *Hugo Boss*, 252 F.3d at 619.

Beazley argues that the district court erred in turning to federal law to provide a definition for "customer," primarily because (1) industry usage should be considered before federal case law; (2) the professional services exclusion was standard language, thus its terms cannot be defined in the context of a specific industry; and (3) other evidence in the record indicates that NASDAQ considered broker-dealers, not retail investors, to be NASDAQ's customers. We find these arguments unavailing.

First, in this context, there is little distinction between looking to "industry usage" and federal case law to define a term. Federal case law is simply another way of determining whether the parties shared a common language that would lead them to a mutual, unambiguous understanding of the meaning of an undefined term.  Second, the fact that the professional services exclusion is a standard clause does not alter the analysis here. The parties are not required to tailor language for every policy in order for terms to have industry-specific meanings. Who counts as a customer of a particular insured within the meaning of the generic exclusion will often depend on the nature of the industry in which the insured does business. What is relevant here is that the insurer sold the policy to its insured, a stock exchange, against the backdrop of well-established federal securities law that unambiguously considers retail investors to be customers of the exchange.

Third, a 2012 rule change NASDAQ submitted to the Securities and Exchange Commission cannot bear the weight Beazley assigns it. There, NASDAQ sought to provide accommodation payments to members who could demonstrate losses stemming from the ill-fated Facebook IPO that the members, in turn, could use to pay claims from retail investors. The rule change  would

make $62 million available to pay claims from retail investors, rather than the $500,000 then available to each member. In submitting the rule change, NASDAQ stated that "[NASDAQ's] business and legal relationships are with its members, not its members' customers. [NASDAQ] has no contractual or other relationships with its members' customers, and generally does not possess information about interactions between a member and its customer that may underlie members' trading activity." App'x at 2578.

Beazley argues this language, at a minimum, raises a question of material fact as to whether NASDAQ considered retail investors its customers. However, as the district court correctly concluded, the fact that retail investors are customers of NASDAQ's member broker-dealers does not mean that retail investors were not also NASDAQ's customers. Broker-dealers are simply agents of the retail investors, performing "the narrow task of consummating the transaction requested." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999). Retail investors may be customers both of NASDAQ and of NASDAQ's members.

We agree with the district court that when considered against the background of the "the customs, practices, usages and terminology as generally

16

understood in the particular trade or business," the term "customers" of NASDAQ unambiguously includes retail investors. *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000). We need not reach the parties' arguments regarding the import of extrinsic evidence in the record.

## II. Professional services

To successfully invoke the exclusion, ACE also must demonstrate that the claims arose out of the "rendering of or failure to render professional services." Under New York law, a court makes such a determination by examining whether the asserted claim could succeed but for the excluded conduct. *See Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 350 (1996) ("[I]f no cause of action would exist but for the [excluded conduct], the claim is based on [the excluded conduct] and the exclusion applies"); *Hugo Boss*, 252 F.3d at 623 n.15 (applying "but for" test to breach of contract policy exclusion). "In other words, if the plaintiff in an underlying action or proceeding alleges the existence of facts clearly falling within such an exclusion, and none of the causes of action that he or she asserts could exist but for the existence of the excluded activity or state of affairs, the insurer is under no obligation to defend the action." *Scottsdale Indem. Co. v. Beckerman*, 992 N.Y.S.2d 117, 121 (2d Dep't 2014).

17

In determining whether a professional service is at issue, courts "[look] to the nature of the conduct under scrutiny rather than the title or position of those involved, as well as to the underlying complaint. . . ." *David Lerner Assocs., Inc. v. Phila. Indem. Ins. Co.*, 934 F. Supp. 2d 533, 541 (E.D.N.Y. 2013) (quoting *Reliance Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P*a., 691 N.Y.S.2d 458, 460 (1st Dep't 1999). "[T]he question of whether one is engaged in a professional service depends on whether those individuals 'acted with the special acumen and training of professionals when they engaged in the acts . . .'" *Id*. (citation omitted).

Here, as below, the parties do not "dispute that the design and operation of NASDAQ's systems require the special acumen and training of professionals, such that these activities constitute professional services." *Beazley II*, 197 F. Supp. 3d at 628 (internal quotation marks omitted). The state law negligence claims set forth in the CAC were based on the allegation that NASDAQ "failed to use reasonable care in the design, testing, and implementation" of its systems. App'x at 164. Again, as below, the parties do not dispute that the negligence claims arose out of NASDAQ's alleged failure to properly render professional services, such that the exclusion applies.

18

Beazley, however, argues that the district court erred in finding that the CAC's federal securities claims were "alleging, based upon, arising out of, or attributable to the rendering or failure to render professional services." Beazley argues that the CAC allegations accusing NASDAQ of misstatements and omissions in violation of federal securities law are advertisements for NASDAQ's services, and thus do not fall under the professional services exclusion. Beazley notes that the CAC pleads that "NASDAQ and its executives . . . undertook an aggressive marketing and commercial campaign to persuade Facebook to list its securities on the NASDAQ Stock Market." App'x at 472 ¶ 17. "In doing do, Defendants Greifeld and Ewing caused NASDAQ to promote the reliability and capability of its technology and electronic trading platform . . . in the months leading up to the Facebook IPO." *Id.* Beazley argues that these representations were made with the intent of promoting NASDAQ as the best exchange for the Facebook IPO. As advertising, Beazley argues, the statements "are not actions that are based upon, arise out of, or that are attributable to the rendering of or failure to render professional services."

Beazley relies on *Rob Levine & Assocs. Ltd. v. Travelers Cas. & Sur. Co. of Am.*, 994 F. Supp. 2d 228 (D.R.I. 2014) for the proposition that actions taken to promote

a business are not professional services. In *Rob Levine*, the complaint alleged that the defendant law firm engaged in false advertising that gave "the false impression to future clients that [they] have special expertise in personal injury cases and disability cases and will recover more money than other Rhode Island lawyers." *Id*. at 232. The law firm sought coverage from its insurer, which disclaimed based on a professional services exclusion that denied coverage "based upon or arising out of any Wrongful Act related to the rendering of, or failure to render, professional services." *Id*. The district court found the exclusion did not apply, because the deceptive advertisement claim is "about advertising, not about the provision of legal services." *Id*. at 233. Other courts also hold that advertising is not a professional service. *See, e.g., Standard Mut. Ins. Co. v. Lay*, 2 N.E.3d 1253, 1259 (Ill. App. Ct. 2014) (professional services exclusion did not apply to advertising claim); *Corky McMillin Constr. Servs. v. U.S. Specialty Ins. Co.*, 597 Fed. App'x 925, 926-27 (9th Cir. 2015) (professional exclusion did not apply to misstatements in marketing and advertising materials).

The flaw in this argument is that the CAC plaintiffs could not win at trial merely by showing that NASDAQ made false and misleading statements as to its capabilities. "To prevail on the merits in a private securities fraud action,

20

investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011). "This requirement is commonly referred to as 'loss causation.' " *Id*. The CAC recognizes this, and pleads loss causation based on failures in the technical service provided by NASDAQ:

> [D]amages [to the class members] were foreseeable and directly caused by the materialization of the concealed risks of Defendants NASDAQ, Greifeld and Ewing; namely, NASDAQ's technology and trading platform technical limitations and resulting failures, including the breakdown of its IPO Cross system, and Defendants' failure to properly test NASDAQ's systems prior to the IPO. The materialization of these risks occurred during the Class Period when NASDAQ's systems failed to: (i) properly execute Class Members' buy and sell pre-market Cross orders and aftermarket orders in Facebook's IPO; and (ii) failed to timely deliver confirmations of Class Members['] pre-market Cross orders, causing Class Members substantial damages.

App'x at 123-24 ¶ 238. The CAC thus attributes plaintiffs' losses to NASDAQ's failure to "properly execute" the purchase and sale orders and deliver timely confirmations, not to NASDAQ's marketing of itself to Facebook as the best exchange to handle the IPO. Failures to properly execute orders and deliver

21

timely order confirmations go to the heart of NASDAQ's provision of professional services. The district court correctly determined that the professional services exclusion applies.

## CONCLUSION

We have considered the remainder of Beazley's arguments and find them to be without merit. For the reasons given above, the judgment of the district court is affirmed.  As the Illinois National policy follows the ACE D&O policy, we need not reach the alternate grounds for affirmance proffered by Illinois National.