# IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>ACE AMERICAN INSURANCE<br>COMPANY,<br><br>    Defendant Below,<br>    Appellant and Cross Appellee,<br><br>v.<br><br>GUARANTEED RATE, INC.,<br><br>    Plaintiff Below,<br>    Appellee and Cross Appellant.</td><td>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§</td><td>No. 360, 2022<br><br>Court Below: Superior Court<br>of the State of Delaware<br><br>C.A. No. N20C-04-268</td></tr>
</table>

Submitted: June 28, 2023
Decided: September 14, 2023

Before **SEITZ**, Chief Justice; **TRAYNOR** and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

John L. Reed, Esquire (*argued*), DLA PIPER LLP (US), Wilmington, Delaware; David Newmann, Esquire, Courtney Devon Taylor, Esquire, Victoria A. Joseph, Esquire, Brittany Armour, Esquire, HOGAN LOVELLS US LLP, Philadelphia, Pennsylvania; Robert J. Katzenstein, Esquire, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *for Defendant Below, Appellant and Cross Appellee ACE American Insurance Company.*

Thomas E. Hanson, Jr., Esquire, William J. Burton, Esquire, BARNES & THORNBURG LLP, Wilmington, Delaware; Lilit Asadourian, Esquire (*argued*), Alice Kyureghian, Esquire, BARNES & THORNBURG LLP, Los Angeles, California; Aaron D. Lindstrom, Esquire, BARNES & THORNBURG LLP, Grand Rapids, Michigan, *for Plaintiff Below, Appellee and Cross Appellant Guaranteed Rate, Inc.*

**SEITZ**, Chief Justice:

Management liability insurance policies provide insurance coverage for a variety of risks associated with running and managing a business. Professional liability policies cover specific risks for businesses that provide professional services. Guaranteed Rate, Inc., a mortgage lender, purchased both types of policies from ACE American Insurance Company. It sought coverage under the policies for an investigation and eventual settlement of claims brought by the federal government under the False Claims Act.

ACE denied coverage under both policies. According to ACE, the Professional Liability Policy expressly excluded False Claims Act charges. ACE also contended that the False Claims Act charges arose from Guaranteed Rate's professional services, which were excluded under the Management Liability Policy. Only the Management Liability Policy is at issue in this appeal.

In Guaranteed Rate's suit against ACE, the Superior Court held that the False Claims Act investigation and settlement did not arise out of Guaranteed Rate's professional services. Instead, it arose out of false certifications made to the government. Thus, the Management Liability Policy covered the loss. We agree with the Superior Court and affirm its judgment, including its disposition of the claims raised on cross-appeal.

I.

A.

Guaranteed Rate, Inc. ("GRI") underwrites and issues loans to borrowers. GRI is an approved lender in the federal government's Direct Endorsement ("DE") mortgage insurance program. As an approved lender, GRI can endorse single-family residential mortgage loans for insurance and guaranty by the Federal Housing Administration ("FHA") and the United States Department of Veterans Affairs ("VA").[1] Under the DE program, approved lenders like GRI certify to the government that each loan and the lender's loan program meet FHA and VA program rules.[2] If a mortgage loan is endorsed by an approved lender and the borrower defaults, the lender can submit a claim to the government to cover certain losses from the default.[3]

In 2017, a former GRI employee brought a *qui tam* action against GRI. The plaintiff, or relator in *qui tam* parlance, alleged that GRI violated the False Claims Act by falsely certifying to the government that the loans it endorsed were eligible for government insurance. The former GRI employee also claimed that GRI falsely certified that it complied with all lending requirements.[4] Under the False Claims

---

[1] App. to Opening Br. at A00208 (Settlement agreement) [hereafter "A__"].
[2] *Id*; A00217–18 (Relator's complaint).
[3] A00208.
[4] A00219–20 (complaint). The former GRI employee alleged that GRI falsely represented: it was not paying commissions to employees performing underwriting services, A00250; it was not pressuring employees to endorse bad loans, A00255; it did not have a policy allowing management

3

Act, a party is civilly liable if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[5]

On June 22, 2019, the U.S. Attorney's Office for the Northern District of New York and the U.S. Department of Justice issued a civil investigative demand ("CID") to GRI. The government notified GRI that it was investigating it for FCA violations. According to the government, "[t]he investigation concern[ed] allegations that [GRI] violated the Act by originating and underwriting federally-insured mortgage loans that failed to meet applicable quality-control requirements."[6]

B.

On July 8, 2019, GRI notified ACE that it received the CID.[7] ACE is part of the Chubb Group and has been referred to as "Chubb" in this litigation.[8] As noted

---

to override government requirements, A00263; employees performing underwriting functions were not being managed by mortgage origination activities, A00271; it was not manipulating variables in order to endorse FHA loans for unqualified buyers, A00272; and it properly calculated and verified borrowers' financials in approving government-insured loans, A00276, A00280, A00281, A00284. The relator also alleged that GRI failed to maintain an adequate quality control program. A00287.

[5] 31 U.S.C. § 3729(a)(1)(A)-(B).

[6] A00421 (CID).

[7] A01782.

[8] A00123 (Amended complaint).

above, GRI purchased two insurance policies from ACE – a Management Liability Policy and a Miscellaneous Professional Liability Policy.[9]

Under the Management Liability Policy, ACE agreed to insure "the Loss . . . which [GRI] becomes legally obligated to pay by reason of a Claim . . . for any Wrongful Acts."[10] Relevant here, "Loss" includes "settlements and Defense Costs;"[11] "Claim" includes "a civil, administrative or regulatory investigation against the Insured;"[12] and "Wrongful Acts" include "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed by" GRI.[13]

Under the Management Liability Policy, ACE is not liable for a Loss from any Claim "alleging, based upon, arising out of, or attributable to any Insured's rendering or failure to render professional services."[14] The Policy does not define professional services. The Policy covers up to $5 million of liability, subject to a $2.5 million self-insured retention.[15] The Professional Liability Policy defines professional services as "mortgage banking and mortgage underwriting services and

---

[9] Opening Br. at 7-8; A01295 (ACE's letter on December 31, 2019).
[10] A00327 (Management Liability Insurance).
[11] A00354–55.
[12] A00353.
[13] A00331–32.
[14] A00357.
[15] A00325.

loan servicing for others for a fee."[16] That Policy expressly excludes coverage for any Claim arising out of the False Claims Act.[17]

## C.

ACE acknowledged receipt of GRI's notice but did not respond substantively until September 2019. In the meantime, GRI supplemented its notice with information that the government investigation also concerned whether GRI's officers or employees violated the False Claims Act.[18] In September 2019, ACE requested a copy of the CID, which GRI provided in December 2019 after the parties negotiated a non-disclosure agreement.[19] GRI also notified ACE in December that they expected to receive a demand from the government in January 2020 and requested a "formal coverage position on an expedited basis."[20]

On January 13, 2020, ACE responded and highlighted the definition of "Claim" and the professional services exclusion in the Management Liability Policy:

> Since no regulatory proceeding has been commenced at this time and no request has been made of an insured individual, Chubb will treat this matter as Notice of Potential Claim under the Policy.

> To the extent this matter becomes a claim under the Policy, you should be aware that Exclusion 2 [i.e., the professional services exclusion] may preclude coverage for this matter.[21]

---

[16] Opening Br. at 9; A01296.
[17] Opening Br. at 9; A01296.
[18] A01802 (Email from Michael Tang).
[19] A02659–60 (GRI's expert report).
[20] A01814 (Email from Kathryn Metz).
[21] A01866 (ACE's denial letter on January 13, 2020).

6

Three days later, GRI advised ACE that the government demanded $24 million to settle the False Claims Act charges.[22] After ACE requested additional information, the parties spoke by phone on January 30, 2020.[23] Even though GRI sought authority to settle, ACE did not take a coverage position on the settlement.[24] On February 5, 2020, GRI settled the FCA claims with the government and the relator for $15.06 million.[25] The government and GRI reached the settlement amount by sampling GRI's FHA loans, analyzing for "defects material to false and fraudulent claims," and calculating a defect rate.[26]

In the settlement agreement, GRI admitted that it underwrote and originated government-insured loans that were not eligible under the FHA and VA programs, "despite representing that such loans complied with applicable program requirements."[27] It also admitted that it did not adhere to the self-reporting requirements, had provided commissions or gifts to its FHA underwriters in violation of FHA requirements, and did not properly organize electronic folders for government loan files. As a result, GRI agreed that it certified, and the government

---

[22] A02670 (GRI's expert report).

[23] A01845–46 (Jon F. Varley's deposition); A01877 (Anwar Shatat's deposition); A01914–15 (Sylvia Toyos' deposition).

[24] A01855 (Varley's deposition).

[25] A00129, A00133 (Amended complaint); A01969 (Email from Shatat).

[26] A00988 (Letter regarding settlement).

[27] A00209 (Settlement agreement).

7

insured, loans approved by GRI that were not eligible for certification and insurance coverage. [28]

In a March 3, 2020 notice, ACE denied coverage for the settlement payment under the Management Liability Policy and invoked the professional services exclusion:

> The Civil Investigative Demand alleges, is based upon, arises out of, and is attributable to the Insured's rendering or failure to render professional services. The investigation concerns allegations that Guaranteed Rate, Inc. violated the False Claims Act by originating and underwriting federally-insured mortgage loans that failed to meet applicable quality-control requirements. In this regard, Exclusion 2. serves to preclude coverage for this matter.[29]

D.

GRI filed this action against ACE and sought coverage for the settlement amount and defense costs for the government investigation and the *qui tam* action. GRI asserted claims for breach of contract and bad faith and sought a declaratory judgment. The parties filed cross motions for partial judgment on the pleadings.

In its first decision, the Superior Court granted GRI's motion and held that the CID fell within the definition of "Claim" under the Management Liability Policy, which triggered ACE's duty to advance defense costs.[30] The court also held that the

---

[28] A00210.

[29] A01526 (ACE's letter on March 3, 2020).

[30] *Guaranteed Rate, Inc. v. ACE Am. Ins. Co.*, 2021 WL 3662269, at *5 (Del. Super. Aug. 18, 2021) [hereinafter "*GRI I*"], *reargument denied*, 2021 WL 4726608 (Del. Super. Oct. 11, 2021), *cert. denied*, 2021 WL 5370794 (Del. Super. Nov. 16, 2021), *and appeal refused*, 266 A.3d 212 (Del. 2021).

professional services exclusion did not bar coverage under the Policy. As the court explained, ACE's position – that the FCA claims fell within the professional services exclusion – contradicted its position in another coverage dispute in *IberiaBank Corp. v. Illinois Union Insurance Co.*[31] In *IberiaBank*, Chubb argued successfully that False Claim Act charges – like here, involving false loan compliance certifications – did not qualify as professional services and therefore were excluded under a professional services policy.

The court also found that the exclusion must be interpreted narrowly in favor of coverage. The term "professional services" was not defined in the Policy, which caused the court to find, based on the record, that GRI's business was underwriting and issuing loans to borrowers, and not maintaining compliance with quality-control standards.[32] Thus, according to the court, the exclusion did not apply.[33]

After discovery related to ACE's affirmative defenses, the parties filed cross motions for summary judgment. ACE argued again that the professional services exclusion applied because the settlement negotiations showed that the settlement was based on GRI's underwriting services. The court disagreed and found that, regardless of whether the FCA claims were about "quality control deficiencies" or

---

[31] 2019 WL 585288 (E.D. La. Feb. 13, 2019), *aff'd*, 953 F.3d 339 (5th Cir. 2020).
[32] *GRI I,* at *4.
[33] The court also denied ACE's motion for reargument. *Guaranteed Rate, Inc. v. ACE Am. Ins. Co.*, 2021 WL 4726608 (Del. Super. Oct. 11, 2021).

"underwriting errors," GRI's duty to meet certain standards was owed to the government, not to the borrowers. The professional services exclusion therefore did not bar coverage.[34] The court granted summary judgment to GRI on its breach of contract and declaratory judgment claims.

Finally, the Superior Court granted summary judgment to ACE on GRI's bad faith claim. The court found that there were good faith disputes about whether ACE had grounds to deny coverage, and GRI's expert report on ACE's bad faith offered only legal conclusions and did not create any genuine issues of material fact.[35]

ACE has appealed the Superior Court's rulings on the professional services exclusion at the pleadings stage and the summary judgment stage. GRI has cross-appealed the Superior Court's ruling on its bad faith claim and failure to credit GRI's expert report.

## II.

We review the grant of a motion for judgment on the pleadings as well as summary judgment *do novo.*[36] The factual allegations are reviewed in a light most favorable to the non-moving party.[37] "A motion for judgment on the pleadings may

---

[34] *Guaranteed Rate, Inc. v. ACE Am. Ins. Co.*, 2022 WL 4088596, at *3 (Del. Super. Aug. 24, 2022).

[35] *Id.* at *9.

[36] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 925 (Del. 2017), *as revised* (June 28, 2017); *Enrique v. State Farm Mut. Auto. Ins. Co.*, 142 A.3d 506, 511 (Del. 2016).

[37] *Chicago Bridge*, 166 A.3d at 917 n.13; *Enrique*, 142 A.3d at 511.

be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[38] Similarly, if disputed issues of material facts exist, summary judgment should not be granted.[39]

A.

The parties agree that GRI renders professional services when engaged in "mortgage banking and mortgage underwriting services and loan servicing for others for a fee."[40] There also appears to be agreement, or at least the lack of a serious dispute, that GRI was not providing professional services if it engaged in wrongful activity that violated the False Claims Act.[41] Where the parties disagree is whether the FCA claims *arose out of* GRI's loan originating and underwriting services, which triggers the professional services exclusion under the Management Liability Policy.

We start our analysis with *IberiaBank*, where Chubb (ACE) argued successfully that False Claims Act charges against the bank did not qualify as professional services under professional liability policies and were therefore excluded from coverage.[42] At the outset, it is important to note that *IberiaBank* is

---

[38] *Chicago Bridge*, 166 A.3d at 925.
[39] *Enrique*, 142 A.3d at 511.
[40] Opening Br. at 9; A01296.
[41] ACE argues that GRI's settlement was based on underwriting errors while performing professional services. But as we explain later, the settlement was based on false statements to the government, not the performance of GRI's underwriting practices.
[42] A02517 (Response Brief of Appellee Illinois Union Insurance Company at 16, *IberiaBank Corp. v. Illinois Union Ins. Co.*, 953 F.3d 339 (5th Cir. 2020) (No. 19-30190)); Illinois Union Insurance Company's Memorandum in Support of Rule 12(b)(6) Motion to Dismiss, *IberiaBank*, 2019 WL 585288 (No. 18-1090).

not pertinent as a matter of judicial estoppel. Instead, it bears on how Chubb (ACE) has interpreted "professional services" under similar policies in similar circumstances. It is also a matter of agreeing with the reasoning supporting Chubb's (ACE's) successful argument to the federal court.

In *IberiaBank*, a former bank employee brought a *qui tam* action against the bank on behalf of the United States government. The employee alleged that the bank falsely certified to the FHA that loans submitted for insurance complied with relevant regulations and were eligible for FHA insurance. Following a government investigation into the charges, the bank paid to settle the dispute.

Chubb insured IberiaBank under professional liability policies. After Chubb denied coverage for the settlement payment and defense costs, IberiaBank filed suit in federal district court. The Eastern District Court of Louisiana agreed with Chubb's argument that submitting false certifications to the federal government was separate from IberiaBank's professional services – loan underwriting for clients – and therefore were not covered losses under the policies:

> The crux of the FCA claims in the *qui tam* action against Iberiabank is that the bank promised to provide a certain level of underwriting in connection with its participation in the DE program; and the bank certified to the government that it provided the agreed level of underwriting when it had not, resulting in the issuance of FHA insurance on ineligible loans, the payment of insurance claims on ineligible loans, and the payment of mortgage commissions in violation of HUD regulations. Thus, while Iberiabank urges coverage by focusing only on its underwriting as the "professional services" triggering coverage under the Chubb policy, the bank ignores its

12

conduct that lay at the heart of the FCA claim and that falls outside the ambit of insurance coverage – namely, Iberiabank's false certifications to the government that it had provided the agreed level of underwriting in connection with obtaining the FHA insurance.[43]

The district court concluded that FCA claims "are not predicated on the insured's professional services" and the insured did not provide "professional services" to the government when it falsely certified loans in the participation of the DE program.[44]

The *IberiaBank* court was on firm precedential footing when it denied coverage under the professional liability policy.[45] For instance, the Seventh Circuit held in *Health Care Industry Liability Insurance Program v. Momence Meadows Nursing Center, Inc.* that a FCA claim did not trigger coverage under the insured's professional liability policy.[46] There, the government alleged that a nursing center falsely certified that it met Medicare and Medicaid provider requirements.[47] The appellate court rejected the insured's argument that the FCA damages were "because

---

[43] *IberiaBank*, 2019 WL 585288, at *7.

[44] *Id.* at *5.

[45] *Id.* at *5 ("Every federal circuit faced with the issue has held that coverage under a professional liability insurance policy is not triggered by claims asserted under the False Claims Act because such claims are not predicated on the insured's professional services that are covered by such a policy."); Illinois Union Insurance Company's Memorandum in Support of Rule 12(b)(6) Motion to Dismiss; *See Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 695 (7th Cir. 2009); *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 921-23 (10th Cir. 2008); *Horizon W., Inc. v. St. Paul Fire & Marine Ins. Co.*, 45 F. App'x 752, 753-54 (9th Cir. 2002); *Jenkins v. St. Paul Fire & Marine Ins. Co.*, 8 F. App'x 573, 574 (8th Cir. 2001).

[46] 566 F.3d at 694–96.

[47] *Id.* at 691.

of" injuries from medical incidents that arose out of the rendering of professional services.[48]  The court found that the damages in the FCA action "result[ed] from th[e] allegedly false filings" and that "[l]iability under the FCA is based solely upon the creation or presentation of false claims to the government, not upon the underlying conduct used to establish the falsity of such a claim."[49]  "[A]ll plaintiffs need to show [for a FCA claim] is that [the insured] billed the government for services and a level of care that it knew it was not providing."[50]

Another example is *Zurich American Insurance Co. v. O'Hara Regional Center for Rehabilitation*, a case once again involving false medical billing by a nursing center.  The Tenth Circuit held that "[t]he government's injury [in an FCA action] was *not caused by* O'Hara's failure to provide professional services, but instead resulted from O'Hara's submission of false and fraudulent claims for reimbursement."[51]  "The problem," the court noted, "was not the actual level of services provided to O'Hara's patients, but rather that O'Hara billed for services it did not provide —namely, enhanced services."[52]

Although these cases involved exclusions under professional liability policies rather than an exclusion in a management liability policy, they nonetheless map

---

[48] *Id.* at 694.
[49] *Id.* at 694–95 (quoting *Horizon W.*, 214 F.Supp.2d at 1077–79).
[50] *Id.* at 695.
[51] *Zurich*, 529 F.3d at 921.
[52] *Id.* at 921-22.

closely to the coverage determination in this case. GRI provided professional services to borrowers through mortgage banking, mortgage underwriting, and loan servicing. The FCA charges, however, did not relate to the performance of professional services it provided to others. Instead, GRI settled charges that it defrauded the government under the FCA by falsely certifying that loans met FHA and VA insurance requirements. GRI's alleged misconduct arose out of the false certifications, not the professional services GRI provided to borrowers. Thus, the FCA charges and eventual settlement did not fall within the professional services exclusion in the Management Liability Policy.

B.

We are not persuaded by Ace's arguments to the contrary. First, ACE argues that the federal cases are distinguishable because the insurance policies in those cases did not use the words "arising out of." *But for* the deficiencies in its underwriting, Ace argues, the FCA claims would not exist. More specifically, ACE claims that the government must demonstrate the deficiencies in GRI's underwriting services to prove that the certifications were false and that the government was harmed. ACE contends further that even if GRI's false certifications are not the only "but for" cause for the FCA claims, multiple "but for" causes should be considered.

It is correct that Delaware courts have interpreted liberally the words "arising out of" in insurance policies. For instance, this Court held in *Pacific Insurance Co.*

15

*v. Liberty Mutual Insurance Co.* that "arising out of" requires "some meaningful linkage between the two conditions imposed in the contract."[53]   There, the meaningful linkage existed between the two conditions – the contractor's operations and the railroad company's resulting liability in a wrongful death action – because the plaintiff alleged that the railroad company had notice of the dangerous condition created by the contractor and failed to exercise reasonable care to eliminate it.  Also, in *Eon Labs Manufacturing, Inc. v. Reliance Insurance Co.*, this Court found that the underlying mass tort claims known as the "fen-phen suits" arose from Eon's pharmaceutical product.[54]   We held that, even when liability is based on the combined use of Eon's product and another product, there was a meaningful linkage to Eon's product because "in all of the cases it is the involvement or presence of Eon's phentermine . . . that is the basis of the fen-phen suits."[55]  "[B]ut for Eon's product," the Court found, "there would be no combination that would lead to the fen-phen claims."[56]

The main problem with ACE's "but for" argument in this case is that the FCA claims were not caused by the professional services provided to borrowers.  There is "no causal connection [] between the failure to perform [professional] services

---

[53] *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1256-57 (Del. 2008).
[54] 756 A.2d 889, 889–90 (Del. 2000).
[55] *Id.* at 893.
[56] *Id.*

16

and the damages alleged by the government."[57]  Also, unlike *Pacific Insurance Co.* and *Eon*, where the harm arose from negligent conditions or the use of a product, the underlying lawsuit here is not based on the failure to perform professional services.[58] In a technical sense, without GRI's underwriting conduct, some of the certifications would not be false.  But a meaningful linkage is absent given the difference between the subject of FCA claims – false certifications – and the underlying conduct used to demonstrate the falsity of the claims – underwriting loans.[59]

ACE has also failed to persuade us that the policy language in this case is materially different from the policy language in other cases.  In *IberiaBank*, for example, the operative language was whether the FCA claim was "*for* any Wrongful Acts *in* rendering or failing to render Professional Services."[60]  In *Zurich*, the policies used the words "*because of*" or "*arising out of*" the rendering of professional services.[61]  Even with the different language, the court found that false certifications were an independent significant act that interrupted the "but for" causal chain between the insured's failure to furnish adequate nursing services and the

---

[57] *Zurich*, 529 F.3d at 923.

[58] *Momence*, 566 F.3d at 695 ("Liability under the FCA is based solely upon the creation or presentation of false claims to the government, not upon the underlying conduct used to establish the falsity of such a claim." (quoting *Horizon W.*, 214 F.Supp.2d at 1077–79)).

[59] *Momence*, 566 F.3d at 695; *IberiaBank*, 2019 WL 585288, at *7.

[60] *IberiaBank*, 2019 WL 585288, at *4 (emphasis added).

[61] *Zurich*, 529 F.3d at 923–24 (emphasis added).

government's injury.[62] The same goes for *Gallup, Inc. v. Greenwich Insurance Co.* There, the professional services exclusion excluded claims "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act . . . in connection with the Insured's performance or failure to perform professional services."[63] The Delaware Superior Court held that the exclusion did not apply because the alleged fraudulent billing practices were not professional services and the exclusion was drafted so broadly that it rendered coverage meaningless under the policy.[64]

ACE's interpretation of "arising out of" effectively extends coverage of the exclusion to just about anything remotely connected to the professional service.

---

[62] *Id.* at 924. As ACE notes, Colorado law governed in *Zurich* and required more than a mere "but for" relation between the injury and the covered activity. Although under Delaware law "arising out" is perhaps more broadly defined, we agree with the *Zurich* court's alternative holding that there is no causal connection between the failure to perform professional services and the FCA claims here.

[63] *Gallup*, 2015 WL 1201518, at *11.

[64] *Id.* at *12-13. ACE argues that the language of the exclusion here is not as broad as the one in *Gallup*. That is correct. The decision, however, is still an example where the court is reluctant to read professional services exclusions to include FCA claims when they are based on false certifications, not professional services. *See also Ambrosio v. Brit UW Ltd.,* 606 F. App'x 885, 887-88 (9th Cir. 2015) (professional services exclusion did not apply where policy provided coverage for "any act, error or omission in connection with the performance of any professional services" whether it was "in connection with," "arising out of," or "due to" professional services because the alleged wrongful conduct in the underlying complaint (encumbering invested property without investors' consent) was too tenuously connected to the rendering of professional services (the sale of securities); *M/G Transp. Servs., Inc. v. Water Quality Insur. Syndicate*, 234 F.3d 974, 977-78 (6th Cir. 2000) (coverage denied where FCA charges against government contractor for falsely certifying Clean Water Act compliance did not arise "by reason of or with respect to" liability under the Clean Water Act: "An FCA action is not converted into a Clean Water Act action simply because a violation of the Clean Water Act is a predicate to establishing the falsity of a claim, or may be used as a measure of damages under the FCA.").

Courts have often held that professional service exclusions do not apply when the act complained of is only incidental to an insured's professional services.[65]  In *Delaware Insurance Guaranty Ass'n v. Birch*, for example, the Superior Court held that the professional services exclusion in a doctor's general liability policy did not apply to a claim brought by a patient alleging the doctor breached the duty not to disclose her confidential medical information.  As the court held, record keeping was incidental to the doctor's professional service.[66]  Adopting ACE's interpretation would mean that many acts only incidentally related to professional services, such as record keeping or false certifications, would be excluded under the professional services exclusion if the act would not have arisen but for the rendering of professional services.[67]  In other words, a linkage must be meaningful, not tangential.

ACE points us to two cases in support of its argument that the FCA claims arose out of the rendering of professional services and fall under the professional

---

[65] *See, e.g., Ambrosio*, 606 F. App'x at 887–88; *Am. Nat'l Fire Ins. Co. v. Abrams*, 2002 WL 243455, at *6 (N.D. Ill. Feb. 19, 2002) (finding that claims against a law firm alleging violations of RICO and fraud did not arise out of the rendering of professional services because risk of fraud is not inherent in the practice of law).

[66] 2004 WL 1731139, at *6 (Del. Super. July 30, 2004).

[67] *See also Hartford Cas. Ins. Co. v. Samuel Eng'g, Inc.*, 2014 WL 959326, at *6 (D. Colo. Mar. 12, 2014) (rejecting the insurer's contention "that the phrase 'arising out of,' as used in the [professional services] exclusion, cause[d] the exclusion to cover non-professional activities that are tied in some way to professional services.").  *But see Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 73 (2d Cir. 2018) (holding that the insured's incorrect advertising, although not part of its professional services, was within the professional services exclusion because the claim arose out of the rendering of professional services).

services exclusion. In *HotChalk, Inc. v. Scottsdale Insurance Co.*, former employees filed a *qui tam* action against HotChalk and alleged that HotChalk violated federal regulations governing enrolling students receiving financial aid, including bans on incentive compensation.[68] The former employees alleged that the violations caused students and the universities they attended to submit false claims to the federal government.

HotChalk purchased a directors and officers liability policy that excluded claims "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failing to render professional services."[69] The Ninth Circuit found that "HotChalk's alleged liability derived from the fact that its professional services caused ineligible students and ineligible universities to submit claims for federal financial aid to the DOE. As a result, the liability arose out of HotChalk's rendering of professional services and was therefore excluded from coverage."[70]

Importantly, the Ninth Circuit also found the connection between the underlying conduct and the FCA violations more than incidental. Instead, as the court held, "the relationship between HotChalk's professional services and its alleged liability was direct and well within the plain language of the professional

---

[68] 736 F. App'x 646 (9th Cir. 2018).
[69] *Id.* at 648.
[70] *Id.*

services exclusion at issue in this case."[71]  Here, however, GRI's false certifications are only incidental to its underwriting services.

Similarly, in *Beazley Insurance Co. v. ACE American Insurance Co.*, the Second Circuit held that a claim alleging that the insured made misstatements and omissions in violation of federal securities law arose out of the insured's professional service providing a functioning trading platform.[72]  The insured argued that its misstatements were in advertisements for its business services and thus were not professional services.  The court held, however, that the plaintiffs' loss was directly caused by the insured's failure to design properly and maintain its trading platform.  The loss was not attributable to the insured's marketing.  The same cannot be said in this case.  What directly caused the government's injury was not GRI's failure to provide professional services, but its false certifications.

The Superior Court correctly concluded that the professional services exclusion did not bar coverage under the Management Liability Policy.

### III.

GRI cross-appeals the Superior Court's summary judgment ruling dismissing its bad faith claim.  GRI argues that genuine issues of fact exist about whether ACE lacked reasonable justification for denying GRI coverage.  According to GRI, ACE's

---

[71] *Id*. at 648 n.2.
[72] 880 F.3d at 71–73.

denial of coverage based on the professional services exclusion was in bad faith because it contradicts ACE's contemporaneous position in *IberiaBank*, the legal authority on the same issue, and ACE's position on its professional liability policy that it issued to GRI. Further, GRI argues that before the government made a demand, ACE acted in bad faith in interpreting the government's civil investigation demand as a notice of potential claim rather than a "Claim" as defined and covered by the Management Liability Policy. GRI also claims that ACE delayed its claim handling in bad faith.

"We have recognized that an insured has a cause of action for breach of the implied covenant of good faith when the insurer refuses to honor its obligations under the policy and clearly lacks reasonable justification for doing so."[73] "Mere delay is not evidence of bad faith, provided that a reasonable justification exists for refusing to make payment . . . ."[74]

ACE had reasonable justification in denying coverage based on the professional services exclusion. ACE made colorable arguments that the same policy language at issue here, i.e., "*arising out of*," is distinguishable from many cited federal cases and the professional liability policy that ACE issued to GRI.

---

[73] *Enrique*, 142 A.3d at 511.
[74] *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 266 (Del. 1995).

Although we ultimately disagree with ACE's position, we cannot say that its position clearly lacks reasonable justification.

GRI also argues that the Superior Court erred by not considering its expert report, which opined that ACE's claim-handling process fell below industry standards. GRI's expert report reads like a legal brief rather than an expert opinion relating to facts. The report cited legal treatises and authorities to support nine general claim-handling principles, which were referred to as "proper claims practices and standards."[75] The expert then expressed an opinion throughout the report that what ACE did fell below such standards. The Superior Court correctly accorded the report little weight for expressing opinions on the law.[76]

IV.

The judgment of the Superior Court is affirmed.

---

[75] A02643–45 (ACE's expert report) (the principles include treating the interests of its policyholder as equal to its own, undertaking thorough and timely investigation, looking for and considering facts and theories that support coverage, being aware that it ultimately bears the burden of proof on establishing exclusion, being aware that courts commonly construe coverage grants broadly and exclusion narrowly, giving words plain meaning, not taking irreconcilable positions whose only consistency is denial of coverage, not hiding the ball regarding coverage positions, and acting in a timely manner).

[76] *See Enrique*, 142 A.3d at 515–16.

23